THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID BAILEY, Defendant-Appellant.

First District (5th Division) No. 84—0809

Opinion filed September 11, 1987.—Rehearing denied December 29, 1987.

556

LORENZ, J., specially concurring.

Steven Clark and Elizabeth Clarke, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and C. Jeffrey Thut, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

Following a bench trial the defendant, David Bailey, was found guilty of murder and sentenced to imprisonment for his natural life. He appeals. For reversal he contends that (1) the trial court erred when it denied his motion to suppress his post-indictment, uncounseled lineup identification on June 8, 1983; (2) the evidence failed to prove the defendant guilty beyond a reasonable doubt; and (3) the mandatory life sentence provision under sections 5—8—1(a)(1)(b) and (a)(1)(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—1(a)(1)(b), (a)(1)(c)) is unconstitutional.

■■ We first address the defendant's contention that the trial court erred in denying the defendant's motion to suppress his uncounseled, post-indictment lineup identification.

The record discloses that Reggie Brownlee and Lisa Kennedy were shot to death in their third-floor residence apartment at 7002 South Harper in Chicago during the early morning hours of May 30, 1983. Biana Castile was visiting in a first-floor apartment in the building and heard the shot. She looked out and saw two men, one of whom had a gun in his hand, running down the stairs from the third floor. The man with the gun was the defendant, David Bailey, with whom Castile was acquainted and knew as "Cochese."

The defendant was arrested on May 30, 1983. He testified on cross-examination on the hearing of his motion to suppress that his arresting officer did not advise him of his right to counsel. He was taken to a police station where, after talking to several assistant State's Attorneys, the last assistant State's Attorney who spoke to him advised him of his rights. The prosecutor did not ask the defendant to state the *Miranda* rights which were given him by the assistant State's Attorney.

Michael Pochordo, a Chicago police detective, testified at the hearing of the suppression motion, in response to a question put to him by the trial court, that he arrested the defendant. He further testified:

"THE COURT: Did you advise him of his *Miranda* rights at that point?

A. Yes, sir.

* * *

THE COURT: Did you specifically tell him at that time that he had a right to an attorney?

A. Yes, sir."

Officer Pochordo did not further expound on the *Miranda* rights he gave the defendant. A diligent search of the record does not reveal

the specific *Miranda* rights which were given the defendant or that the defendant was even given the complete *Miranda* admonitions when he was arrested or at any time thereafter.

A complaint for preliminary examination was subscribed and sworn to by Chicago police detective Michael Pochordo on May 31, 1983. The complaint alleged that the defendant, David Bailey, on May 30, 1983, at 7002 South Harper, Chicago, Cook County, Illinois, committed the offense of murder of Lisa Kennedy in that he killed Lisa Kennedy without lawful justification by shooting her with a gun. (Ill. Rev. Stat. 1985, ch. 38, par 9—1(a)(3).) The complaint was filed on June 1, 1983, in Branch 66, a preliminary hearing court of the circuit court of Cook County. The defendant testified that he was taken before that court on that date and that an attorney appeared with him and represented him at that time. The record reveals that the Branch 66 preliminary hearing judge ordered that the defendant be held without bail in the Cook County Department of Corrections and further ordered that the sheriff of Cook County bring the defendant before the chief judge of the criminal division of the circuit court of Cook County on June 22, 1983.

On June 3, 1983, however, the indictment was returned by the grand jury and was filed by the court clerk. The first six counts of the indictment charged that the defendant murdered, by shooting, Reggie Brownlee and Lisa Kennedy on May 30, 1983, in Cook County, Illinois. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3).) Counts 7 and 8 alleged that the defendant committed the offense of armed robbery of Reggie Brownlee and Lisa Kennedy on the aforesaid date and place. (Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a).) The defendant was charged in counts 9 and 10 with the offense of armed violence upon Reggie Brownlee and Lisa Kennedy on said date and place. Ill. Rev. Stat. 1985, ch. 38, pars. 33A—2, 9—1(a)(2).

On June 1, 1983, the date the indictment was filed with the court clerk, an attorney also filed with the court clerk his written appearance as attorney for the defendant in the case. Although the attorney signed his name on the appearance form somewhat illegibly, he clearly listed his telephone number thereon as 236-7543.

The defendant testified that after he appeared on the complaint in Branch 66 preliminary hearing court on June 1, he was taken to the Cook County jail. He stated that he was visited in the jail by Attorney Steven Vandross, who told the defendant that he might become the defendant's attorney in the case.

Detective Pochordo testified that he and his partner, Detective Catherine Reardon, worked on the Reggie Brownlee and Lisa

Kennedy homicides and that he knew the indictment had been returned on June 3, 1983, when he decided on June 7, 1983, to conduct a post-indictment lineup for the witness, Biana Castile, to view the defendant. Detective Pochordo further testified that he also knew that the law guaranteed the defendant the right to have an attorney present and represent him at the lineup.

Pochordo related that on the afternoon of June 7, he attempted to find out who the defendant's lawyer was but he was unable to do so. He stated that he called the clerk's office on June 7 to have the clerk search the court records to determine the defendant's attorney of record but that the clerk was unable to do so.

Pochordo did not identify the court clerk to whom he spoke. Pochordo did not disclose which of the numerous offices of the clerk of the circuit court he called. Nor did Pochordo relate what the clerk did to ascertain the identity of the defendant's attorney. The record does not reveal whether the clerk gave Pochordo the telephone number, 236-7543, which was on the defendant's attorney's appearance form. Although Pochordo was unable to learn who the defendant's attorney was, Pochordo testified further on cross-examination that he made no effort on June 7 to contact the Office of the Cook County public defender to advise anyone there that he planned to conduct a lineup the following morning at the Cook County jail witness quarters with the defendant, who was in the Cook County jail and did not have an attorney, so that the public defender's office would have an attorney present at the lineup to represent the defendant.

There is no evidence that Pochordo utilized any of the information from the defendant's arrest report to notify any member of the defendant's family to have an attorney present to represent the defendant at the lineup on June 8, 1983, at the Cook County jail witness quarters.

Pochordo testified that on June 7, 1983, he called a sheriff's investigator to have the defendant brought from the division in which the defendant was lodged in the Cook County jail to the Cook County jail witness quarters on June 8, 1983, for a lineup. The record does not disclose that Pochordo asked the sheriff's investigator or anyone in the administrative office of the Cook County jail to check the defendant's Cook County jail records to determine if the records revealed whether the defendant had a lawyer, and if so, who he was. Nor does the record in the case at bar disclose that Pochordo asked any Cook County jail personnel to ask the defendant who his lawyer was so that Pochordo could notify him to be present on the following day to represent the defendant at the lineup at the

Cook County jail witness quarters.

From the foregoing and the hereinafter mentioned events, it is apparent that Detective Pochordo was determined to conduct a lineup of the defendant whether or not the defendant's attorney was present or the defendant desired his attorney's presence at the lineup.

The defendant testified that at about 10:30 on the morning of June 8, 1983, he was on his tier in Division 6 of the Cook County jail on Sacramento Avenue when he received a pass from the jail officer on his tier. The defendant knew that he had been indicted for murder and he asked the officer where he was to go. The officer did not know because the defendant's destination on the pass was in code instead of stating the usual destination. The defendant was taken to the first floor and then to the witness quarters in Division 1, where the defendant saw Detective Pochordo.

Detective Pochordo testified that on the morning of June 8, 1983, he went to the witness quarters of the Cook County jail for the purpose of conducting a lineup. He testified that his partner, Catherine Reardon, an evidence technician, Assistant State's Attorney Durkin from the Felony Review Unit of the Cook County State's Attorneys office, an investigator from the Cook County sheriff's office and a witness accompanied him. It was stipulated that the witness was Biana Castile. After having been unable the previous day to learn who the defendant's attorney was in order to notify him to be present to represent the defendant at the lineup, after having notified the jail officials to transfer the defendant from his tier to the witness quarters for a lineup, after having accompanied his partner, an evidence technician, and an assistant State's Attorney to the witness quarters for a lineup, and after having escorted the witness Biana Castile to the witness quarters for a lineup, it convincingly appears that Detective Pochordo was determined to have a lineup whether or not the defendant's attorney was present to represent the defendant or whether or not the defendant requested his attorney's presence at the lineup. Inasmuch as Pochordo had been unable to notify the defendant's attorney to be present on June 8, 1983, to represent the defendant at the Cook County jail witness quarters lineup because he did not know who the defendant's attorney was, it would seem that Pochordo would not have taken the witness Biana Castile and the others to the lineup without first ascertaining whether the defendant would agree to participate in the lineup without his lawyer being present. The lineup, however, was already set up when Pochordo first arrived at the witness quarters with the witness Biana Castile.

Pochordo testified that when he arrived at the county jail witness

quarters he had a conversation with the defendant. Pochordo then significantly testified (on direct-examination):

"Q. [D]o you recall who else was present when you had a conversation with [the defendant] David Bailey?

A. *The other inmates that were standing in the lineup.*" (Emphasis added.)

Pochordo further stated that there were four Cook County jail inmates in the lineup with the defendant. From this foregoing testimony of Pochordo, it is apparent that the lineup was already formed and in place with the defendant in it when Pochordo asked the defendant about his attorney and whether he wanted his attorney present at the lineup to represent him.

Thereupon, the prosecutor did not ask Pochordo proper nonleading questions, such as to simply relate the conversation he had with the defendant. The prosecutor instead asked Pochordo leading and suggestive questions about the lineup right to counsel admonition he gave the defendant, set forth in Appendix I. From these leading and suggestive questions and Pochordo's answers thereto it is evident that Pochordo did not advise the defendant of his right to have an attorney present at the lineup, the function the attorney would serve at the lineup and thereafter at trial and the consequence of the defendant's relinquishment of his right to have an attorney present at the lineup. Equally important, there was no showing that the defendant was advised of the consequence of his insistence that an attorney be present to represent him at the lineup, *i.e., inter alia,* that the lineup would not be held if his attorney was not present.

Moreover, from Pochordo's foregoing testimony it is apparent that the defendant did not waive his right to an attorney's presence to represent him at the lineup. The assistant State's Attorney's questions to Pochordo were not only leading and suggestive, they were also circumspect. Pochordo's answers were correspondingly crafty. After Pochordo responded to the aforementioned questions, the prosecutor finalized his direct examination of Pochordo with the following belated but equally suggestive question:

"Q. Did, in your conversation earlier that morning with David Bailey, did he ever tell you that he wished to have a lawyer present during the line up?"

Pochordo answered, "No, he stated he didn't need a lawyer."

First, it was not the defendant's responsibility to initially advise Pochordo that he wished to have a lawyer present at the lineup. Instead, the burden was on Detective Pochordo and Assistant State's Attorney Durkin to first fully advise the defendant of his right to

have an attorney present to represent him at the lineup, the function his attorney would serve during the lineup proceedings, and the consequences of the defendant's exercising or waiving his right to counsel at the lineup. Second, the foregoing questions and answers are inadequate to establish (1) that the defendant was fully and adequately advised of his right to counsel at the lineup; (2) that an attorney would be furnished if he did not have or could not afford one; (3) the role and duty his attorney would serve at the lineup; (4) the consequences of the defendant's insistence upon his attorney's presence at the lineup; (5) the consequences of the defendant's waiver of his attorney's presence at the lineup; or (6) that the defendant knowingly, intelligently, freely and voluntarily waived his right to the presence of his attorney to represent him at the lineup. Third, according to Pochordo, this highly probative and extremely important statement attributed by Pochordo to the defendant, *i.e.*, "he didn't need [a lawyer]," on which the State relies to establish that the defendant waived his right to an attorney's presence and representation at the lineup, was significantly omitted from Pochordo's police report. Fourth, this statement attributed to the defendant by Pochordo can be reasonably construed simply as an expression by the defendant that he had a lawyer and thus did not need an additional one.

An analytical reading of the foregoing questions and Pochordo's answers reveals that during Pochordo's exclusive conversation with the defendant, the defendant told Pochordo that (1) he was not then represented by an attorney; (2) the attorney who formerly represented him at the hearing on May 31 in Branch 66 had been fired and no longer was the defendant's attorney; (3) the defendant did not want *that* attorney to be present during the lineup; (4) the defendant wished to hire another private attorney and that his family was obtaining an attorney for him later that week or the next; (5) the defendant did not wish to have that attorney present at the lineup because the attorney had not yet been hired; and (6) the defendant did not want anyone from the public defender's office present at the lineup to represent him.

No explanation is offered why no one other than the four jail inmates was present during Pochordo's conversations with the defendant. Pochordo's partner, Detective Catherine Reardon, was not present. Assistant State's Attorney Durkin was not present. Nor was the sheriff's investigator or the crime laboratory technician. Whether Pochordo was of the opinion that corroboration of his conversation with the defendant would be unnecessary need not be discussed or decided.

The defendant testified that when he saw Pochordo in the Cook County jail witness quarters on June 8, Pochordo asked him if he had an attorney and the defendant told him that he did and his name was Steven Vandross, that Mr. Vandross had not appeared in court on his behalf, that his family had contacted Mr. Vandross about representing the defendant and Mr. Vandross had visited him in the Cook County jail. Mr. Vandross was not called by the State, nor were any Cook County jail personnel or records presented by the State to refute the defendant's testimony.

The defendant further testified that Pochordo did not ask him if he wanted Mr. Vandross to be present at the lineup and he denied that he told Pochordo that his attorney was being fired and that his family was trying to hire another lawyer. The defendant stated that Pochordo did not tell him that he had the right to have an attorney present during the lineup, but that he asked to have an attorney present at the lineup. The defendant also testified that Pochordo did not ask him if he wanted a public defender to be present at the lineup. The defendant stated that after his conversation with Pochordo he was palm printed and fingerprinted. It is reasonable to assume that the defendant was printed by the evidence technician who accompanied Pochordo to the witness quarters for that purpose.

Supreme Court Rule 413(a)(iii) (87 Ill. 2d R. 413(a)(iii)) provides the procedure for the State to obtain a defendant's palm and fingerprints after the defendant has been indicted. The rule states: "Notwithstanding the initiation of judicial proceedings, and subject to constitutional limitations, a judicial officer may require the accused, among other things, to: *** be fingerprinted ***." Supreme Court Rule 413(a) was not followed in the case at bar. The Illinois Supreme Court did not contemplate in the promulgation of Supreme Court Rule 413(a) that after a defendant has been indicted and under the court's jurisdiction in the Cook County jail awaiting trial, a police officer would enter the jail and take a defendant's fingerprints and palm prints without prior judicial approval or constitutional safeguards.

The defendant testified that Pochordo did not ask him if he wanted a public defender to be present at the lineup. Conversely, Pochordo testified that when he told the defendant that he "would notify the Cook County public defender's office and advise them of the situation at the jail and have someone from their office present to represent him during the lineup," the defendant stated, according to Pochordo, that he did not want the public defender to represent him at the lineup. Significantly, Pochordo testified on cross-examination that his offer and the defendant's rejection of the public defender to

represent the defendant at the lineup were not set forth in Pochordo's police report.

Even though the defendant had told Pochordo, according to Pochordo, that he did not want the public defender present to represent him at the lineup, and immediately thereafter Pochordo told Assistant State's Attorney Durkin that the defendant had told him that he did not want the public defender present to represent him at the lineup, Pochordo nevertheless accompanied Durkin to make a telephone call to the public defender's office to request an assistant public defender to come to the Cook County jail to represent the defendant at the lineup. Pochordo further related that Durkin talked on the telephone to someone in the public defender's office who stated that a representative from that office would appear to represent the defendant at the lineup at approximately 10:50 a.m. Pochordo did not remember to whom Durkin spoke in the public defender's office. Pochordo testified that he waited for the arrival of an assistant public defender to represent the defendant at the lineup.

It is difficult to perceive that Detective Pochordo and Assistant State's Attorney Durkin would attempt to obtain and wait over an hour for an assistant public defender to represent the defendant at the lineup after the defendant had told Pochordo that he did not need a lawyer and that he did not want the public defender to be present or represent him at the lineup. This testimony demands cautious and meticulous scrutiny.

It appears to be more reasonable, certainly it is more persuasive, that when Pochordo talked to the defendant in the presence of the four other Cook County jail inmates in the lineup, the defendant, having been to court and having talked to his lawyer, advised Pochordo that he desired an attorney to be present to represent him at the lineup, as the defendant testified, and thereafter Pochordo informed Durkin of the defendant's desire and Durkin therefore called for an assistant public defender to represent the defendant at the lineup.

The defendant testified that he was not aware that the public defender had been called. The defendant stated that he requested that a lawyer be present at the lineup and that a few minutes before the lineup the sheriff's investigator who escorted him from his tier to the witness quarters told the defendant that someone had called the public defender's office to determine if a lawyer was available to represent him.

Pochordo testified that he was aware that there were time restrictions for conducting a lineup at the Cook County jail, that all lineups at the Cook County jail had to be terminated by 11 a.m. and that they

had to get the defendant's lineup over by that hour. He testified that when an assistant public defender failed to appear, no one called the public defender's office to inquire why an assistant had not appeared or if an assistant was going to appear.

The defendant was confined in the Cook County jail on double murder and armed robbery charges in the custody of the sheriff with no bail pursuant to court order. It was unlikely that he was going anyplace and the lineup could have been postponed for the defendant's attorney's presence without any detriment to the State's case. Yet, Pochordo went ahead and conducted the lineup at 10:55 a.m. in the absence of the defendant's attorney. The State stipulated that the defendant's attorney was not present at the lineup.

Pochordo testified that he did not give the defendant his *Miranda* warnings that morning and there is no evidence that anyone else advised the defendant of his *Miranda* rights. Pochordo related that he did not have the defendant sign a waiver of counsel for the lineup. The State also stipulated that Biana Castile viewed and picked the defendant out of the lineup as one of the men she saw fleeing down the stairs from the floor on which Reggie Brownlee and Lisa Kennedy resided after hearing gunshots emanating from that floor.

Illinois Supreme Court Rule 413(a) also provides for a defendant's participation in a lineup after indictment. The rule states: "Notwithstanding the initiation of judicial proceedings, and subject to constitutional limitations, a judicial officer may require the accused, among other things, to: (1) appear in a line-up \*\*\*." The Illinois Supreme Court recognized that after a defendant was under the jurisdiction of the trial court under an indictment, a most critical stage in the adversarial proceedings, law enforcement officers should not have the unbridled power to subject a defendant to a lineup without constitutional restraints. Supreme Court Rule 413(b) (87 Ill. 2d 413(b)) provides:

> "Whenever the personal appearance of the accused is required for the foregoing [purposes of a lineup], reasonable notice of the time and place of such appearance shall be given by the State to the accused and his counsel, who shall have the right to be present."

At the conclusion of the presentation of the testimony on the hearing of the motion to suppress the lineup identification, the trial judge agreed, pursuant to the defense attorney's request, to "take judicial notice of the official document in the court file, \*\*\* an appearance on file dated June 1, 1983, by a private attorney." The defense attorney pointed out to the trial judge that although the attorney's name on the appearance was practically illegible, the attorney's tele-

phone number on the appearance was clear. The telephone number on the attorney's appearance in the record is 236-7543. Although a few of the letters of the attorney's name on the appearance can be discerned, the complete name is illegible and we will not speculate on his identity. The appearance is that of the attorney who appeared as the defendant's attorney on June 1, 1983, in Branch 66, the preliminary hearing court to which reference herein is previously made.

The following stipulation was agreed upon at the conclusion of the suppression hearing:

"[Assistant State's Attorney]: It will be stipulated between the parties that if Assistant State's Attorney Durkin, D-u-r-k-i-n, were called on to testify, he would testify that he was an assistant state's attorney assigned to the Felony Review Unit, 26th and California, on the 8th of June, 1983, that he proceeded to the Cook County Jail at approximately 9:50 in the morning, witness quarters. He would testify that at 10:05 in the morning he called the Public Defender's Office and asked that the public defender be sent over. They indicated an individual named Jamie Kunz might come over. That at 10:50 in the morning, excuse me, they indicated they would send someone over by 10:50 in the morning. They waited until 10:55 and no one arrived. The lineup was then held. So stipulated?

[Defendant's attorney]: So stipulated."

Both sides rested and waived argument. The trial court overruled the suppression motion.

The sixth amendment to the Constitution of the United States provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to have the [a]ssistance of [c]ounsel for his defence." (U.S. Const., amend. VI.) The comparable article 1, section 8, of the Illinois Constitution provides that "[i]n criminal prosecutions, the accused shall have the right to appear and defend in person and by counsel." (Ill. Const. 1970, art. 1, sec. 8.) The Supreme Court pointed out in *United States v. Wade* (1967), 388 U.S. 218, 224-25, 18 L. Ed. 2d 1149, 1156, 87 S. Ct. 1926, 1931, that today's law enforcement techniques involve critical confrontation of the accused by the prosecution at post-indictment pretrial proceedings where the results could resolve the accused's fate, reducing the trial to a mere formality and that the cases have therefore construed the aforementioned constitutional guarantee of counsel to encompass counsel's assistance whenever necessary to assure the accused a meaningful defense and applies to the critical stages of the proceedings. The Supreme Court further pointed out in *Wade* that the principle of *Powell v. Alabama*

(1932), 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55, and the cases following, demands that courts scrutinize pretrial confrontation of the accused to ascertain if the presence of the defendant's counsel was essential to preserve the defendant's fundamental right to a fair trial as affected by his right to meaningfully cross-examine the witness against him and to have the effective assistance of counsel at the trial. (*United States v. Wade* (1967), 388 U.S. 218, 227, 18 L. Ed. 2d 1149, 1157, 87 S. Ct. 1926, 1932.) The Supreme Court in *Wade* held that an accused's sixth amendment constitutional right to counsel entitled him to the presence and representation of counsel at a post-indictment lineup, when it stated:

> "Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial, there can be little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution at which he 'was as much entitled to such aid [of counsel] *** as at the trial itself.' [Citation.] Thus both Wade and his counsel should have been notified of the impending lineup, and *counsel's presence should have been a requisite to conduct of the lineup, absent an 'intelligent waiver.' "* (Emphasis added.) 388 U.S. 218, 236-37, 18 L. Ed. 2d 1149, 1162-63, 87 S. Ct. 1926, 1937.

In *Moore v. Illinois* (1977), 434 U.S. 220, 54 L. Ed. 2d 424, 98 S. Ct. 458, at the defendant's preliminary hearing, during which the defendant was not represented by counsel, the rape-robbery victim identified the defendant as her assailant. The trial court overruled the defendant't motion to suppress the victim's testimony of her preliminary hearing identification of him and at trial the victim testified that she identified the defendant as her assailant at the preliminary hearing. The victim also testified and identified at trial the defendant as the man who raped and robbed her. The Supreme Court reversed the defendant's conviction, stating:

> "[P]etitioner's Sixth Amendment rights were violated by a corporeal identification conducted after the initiation of adversary judicial criminal proceedings and in the absence of counsel. The courts below thought that the victim's testimony at trial that she had identified petitioner at an uncounseled pretrial confrontation was admissible even if petitioher's rights had been violated because there was an 'independent source' for the victim's identification at the uncounseled confrontation.

[Citations.] But *Gilbert* held that the prosecution cannot buttress its case-in-chief by introducing evidence of a pretrial identification made in violation of the accused's Sixth Amendment rights, even if it can prove that the pretrial identification had an independent source. 'That testimony is the direct result of the illegal lineup "come at by exploitation of [the primary] illegality." ' " 434 U.S. 220, 231, 54 L. Ed. 2d 424, 435-36, 98 S. Ct. 458, 466.

The supreme court of Illinois held in *People v. Curtis* (1986), 113 Ill. 2d 136, 143, 497 N.E.2d 751, that "[a] lineup which is held after the initiation of 'adversary judicial criminal proceedings' without the presence of counsel for the accused is unconstitutional. [Citation.] Once it has been determined *** that a lineup violates the sixth amendment right to counsel, any evidence adduced by the prosecution that a witness identified the defendant at the lineup is subject to a *per se* rule of exclusion. [Citations.]" "A *per se* rule excluding testimony that the accused was identified at an uncounseled lineup may be the only 'effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup.' " 113 Ill. 2d 136, 145, 497 N.E.2d 751.

Application of these principles to the case at bar required the presence of the defendant's counsel at the post-indictment lineup. The State, however, relies on a triple-barreled basis for the validation of the post-indictment, uncounseled lineup, *i.e.*, first, the State endeavored to ascertain who was the defendant's lawyer; second, unable to do so, the State unsuccessfully attempted to obtain an assistant public defender to be present and represent the defendant at the lineup; third, being again unable to do so, the defendant didn't want a lawyer to be present and represent him at the lineup. The mere statement of the State's position demonstrates its fallacy. Moreover, with regard to the State's three-pronged lineup position, as well as the trial court's conclusion that the defendant waived his right to counsel at the lineup, the following language of the Supreme Court in *United States v. Wade* (1967), 388 U.S. 218, 231, 18 L. Ed. 2d 1149, 1160, 87 S. Ct. 1926, 1934, is informatively predictable:

"[A]ny protestations by the suspect of the fairness of the lineup made at trial are likely to be in vain; the jury's [judge's] choice is between the accused's unsupported version and that of the police officers present."

In the case at bar, the defendant protests the fairness of the lineup on the ground that he was denied his right to counsel. More importantly, he protests that he did not waive his right to counsel at

the lineup. Likewise in the case at bar, the judge's choice was between the defendant's unsupported version and that of the police officer present. Defendant's protestations at trial were made in vain.

■ In the case at bar, however, the trial judge clearly misconstrued and erroneously recapitulated the evidence and as a result thereof erroneously denied the defendant's suppression motion.

At the conclusion of the presentation of the evidence at the hearing on the defendant's suppression motion and after the State and the defendant had rested, the trial court suggested to counsel that arguments in support of their respective positions were unnecessary. The trial court stated:

> "Either side wish to argue the motion? *Don't feel compelled to if you don't wish to.*" (Emphasis added.)

Thereupon both counsel waived argument. In overruling the defendant's suppression motion, however, the trial court stated: "I find I do not know *** what precisely the defendant's position is."

The defendant's position in the trial court is clear from the record before us. His position was that his constitutional right to counsel at the lineup was violated, that he did not waive his right to counsel at the lineup, and his lineup identification should therefore be suppressed. If the trial court was unclear or did not know what the defendant's position was, the trial court should not have suggested to the attorneys to waive argument on the suppression motion. From such argument, the trial court surely would have been advised of the defendant's position. Moreover, the trial court should not have denied the defendant's suppression motion simply because he did not know the defendant's position. The trial court's unfamiliarity with the defendant's position was an improper factor in the trial court's determination of the suppression motion.

The trial court relied on its erroneous recapitulation of the evidence in ruling on the defendant's suppression motion and thereby incorrectly denied the motion. The trial court stated and held:

> "There had been a discussion of counsel before the lineup occurred and the question then is whether or not the defendant waived that right.
>
> There is a conflict in the testimony between the officer and the defendant on that issue. It is not a factual issue that's easily resolved, however, in this case *the defendant has testified on direct examination that there was no discussion concerning the public defender, and in cross examination he then claims that he affirmatively requested a public defender.*
>
> I find I do not know, therefore, what precisely the defend-

ant's position is. I must look to the testimony of the police officer who is corroborated by the stipulation.

I feel that the defendant did in fact waive his right to counsel for the lineup. The motion to suppress the identification testimony, therefore, is denied." (Emphasis added.)

From the complete direct testimony of the defendant on the subject of the public defender, contrary to the trial court's mistaken assertion, it is clear that the defendant did testify on direct examination that there was a discussion concerning the public defender. The direct testimony by the defendant is set out in Appendix II. The direct testimony discloses that the trial court erred when it concluded that the defendant testified on direct examination that there was no discussion concerning the public defender. The trial court further concluded:

"In this case, I'm satisfied that the defendant was aware that the right existed, he was certainly advised after his arrest to his right of counsel, even by his own testimony at some point before the lineup by an assistant state's attorney."

As previously pointed out, there is no evidence in the record that the defendant was fully admonished of his *Miranda* rights when he was arrested on May 30, 1983. The defendant testified that an assistant State's Attorney told him when he was arrested that he had a right to an attorney. Presumably this was the *Miranda* advisement of the defendant's right to an attorney during custodial investigative interrogation. This admonition to the defendant on May 30, 1983, of his right to an attorney during custodial investigative interrogation cannot be said to carry over as a complete admonition to the defendant of his right to the presence and representation of an attorney eight days later at a post-indictment lineup.

In *People v. Brown* (1974), 56 Ill. 2d 312, 307 N.E.2d 356, the supreme court of Illinois upheld the validity of the admission into evidence of the defendant's two inculpatory statements, made after *Miranda* admonitions following the defendant's illegal arrest, on the ground that the *Miranda* warnings to the defendant attenuated the taint of the illegal arrest. In the case at bar, it appears that the trial court inferentially sought to uphold the validity of the defendant's uncounseled, post-indictment lineup identification on the ground that its illegality was attenuated by the *Miranda* admonitions to the defendant by the arresting officer and assistant State's Attorney at the time of the defendant's arrest eight days earlier. On review the Supreme Court of the United States stated in *Brown v. Illinois* (1974), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, that it could uphold the admissibility of the defendant's first statement only if it overruled

*Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, which the Supreme Court stated it was unwilling to do. The Supreme Court further stated that the defendant's second statement was clearly the result and the fruit of his first illegal statement. In reversing, the Supreme Court held:

> "*The Miranda warnings* are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances [citation], and, particularly, the purpose and flagrancy of the official misconduct are all relevant. [Citation.] The voluntariness of the statement is a threshold requirement. [Citation.] And the burden of showing admissibility rests, of course, on the prosecution." *Brown v. Illinois* (1974), 422 U.S. 560, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62.

In the instant case, the *Miranda* warnings given the defendant and the extent to which they were given when the defendant was arrested were factors to be considered in determining the validity of the subsequent post-indictment, uncounseled lineup identification. The temporal proximity of the *Miranda* warnings and the lineup, the presence of intervening circumstances such as the filing of the murder complaint against the defendant, his appearance with counsel in court thereon, his lodgement thereafter in the county jail and his attorney's visit there with him, and "particularly, the purpose and flagrancy of the official misconduct are all relevant." *Brown v. Illinois* (1974), 422 U.S. 590, 604, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2262.

The fifth amendment constitutional privilege against self-incrimination confers upon an arrestee during police investigation, as well as during the critical adversarial proceedings, the right to *Miranda* admonitions and counsel prior to and during any law enforcement interrogation of him. *Miranda v. Arizona* (1966), 384 U.S. 436, 479, 16 L. Ed. 2d 694, 726, 86 S. Ct. 1602, 1630, mandates that when an individual is taken into custody and is subjected to questioning, the fifth amendment privilege against self-incrimination requires:

> "He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have

been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."

The sixth amendment constitutional right to counsel during the critical adversarial stage confers upon the defendant the right to *Wade* admonitions and the presence and representation of counsel at his post-indictment lineup. The functions of the defendant's attorney at the post-indictment lineup are somewhat different and appreciably more extensive than the role of the arrestee's attorney before or during custodial investigative interrogation of the arrestee by law enforcement officers. The reasons for the presence and representation of a defendant's attorney at the post-indictment lineup were articulated by the Supreme Court in the following passage in *Wade*:

"[T]here is serious difficulty in depicting what transpires at lineups and other forms of identification confrontations ***. [Citation.] *** [The defendant] can seldom reconstruct the manner and mode of lineup identification for judge or jury at trial. *** [N]either witnesses nor lineup participants are apt to be alert for conditions prejudicial to the suspect. *** [N]either witnesses nor lineup participants are likely to be schooled in the detection of suggestive influences. Improper influences [at the lineup] may go undetected by a suspect ***. Even when he does observe abuse, *** [the defendant] may be reluctant to take the stand ***. *** [A]ny protestations by the suspect of the fairness of the lineup made at trial are likely to be in vain; the jury's choice is between the accused's unsupported version and that of the police officers present. *** [T]he accused's inability effectively to reconstruct at trial any unfairness that occurred at the lineup may deprive him of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification.

\* \* \*

*** [T]he more numerous defendants who are unable to ferret out suggestive influences in the secrecy of the confrontation.

\* \* \*

*** [T]here is grave potential for prejudice, intentional or not, in pretrial lineup, which may not be capable of reconstruction at trial, and [the] presence of counsel itself can often avert

prejudice and assure a meaningful confrontation at trial ***.

* * *

*** [C]ounsel's presence at the lineup would equip him to attack not only the lineup identification but the courtroom identification as well ***." (*United States v. Wade* (1967), 388 U.S. 218, 230-32, 234-36, 241, 18 L. Ed. 2d 1149, 1159-60, 1162, 1165, 87 S. Ct. 1926, 1934-35, 1936-37, 1939.)

The Supreme Court concluded in *Wade* that the defendant's counsel's presence is a requisite for a post-indictment lineup, in the absence of an intelligent waiver of counsel by the defendant. The Supreme Court, however, did not specifically articulate in *Wade* the post-indictment right-to-counsel lineup admonitions that the sixth amendment requires be given a defendant. Certainly the sixth amendment, right-to-counsel *Wade* admonitions, during the critical adversary stage of the proceedings, would be no less than those required by the fifth amendment privilege against self-incrimination *Miranda* admonitions during the custodial investigative interrogation precritical adversary stage of the proceedings. The sixth amendment, right-to-counsel *Wade* admonitions seemingly would require more. The *Wade* admonitions would certainly at least require that the defendant be informed of his right to the presence and representation of counsel at the lineup, that if he did not have or could not afford an attorney, an attorney would be provided him to be present and represent him at the lineup. Further, that the presence and representation of his attorney at the lineup is to insure the fairness of the lineup and to enable his attorney to utilize any lineup unfairness for the defendant's benefit at trial, that in the absence of his waiver of counsel, the defendant could not be compelled to participate in a lineup without his counsel being present and that the lineup would not be conducted in his counsel's absence. The *Wade* admonitions also require that the defendant be fully advised of the consequences of his waiver of counsel at the lineup and that, in order for there to be a valid relinquishment of the *Wade* right to counsel, it must be voluntarily, knowingly and understandingly waived by the defendant. There is no evidence that these admonitions were given the defendant in the case at bar and there was no knowledgeable waiver of counsel at the lineup by the defendant.

The trial court was also under a misapprehension in its denial of the defendant's suppression motion when the trial court stated:

"The legal issue here, I think, is rather clear. It is clear to me that this was a post-indictment lineup, the adversary procedure had clearly begun, and under the case law, there is a right

to counsel at the out of court identification procedure.

The law provides that to be a *per se* rule, and the issue here is whether or not the defendant waived his right to counsel at that lineup procedure.

I believe it is fair to say that *the waiver at this point is not precisely the same as the waiver that is required in the Miranda situation.*" (Emphasis added.)

■ Contrary to this inference of the trial court, our research fails to reveal a case which holds that to waive the *Wade,* sixth amendment right to admonitions and to an attorney during the post-indictment lineup, critical adversarial stage, permits less than is required to waive the *Miranda,* fifth amendment privilege against self-incrimination and the attendant right to an attorney during the interrogation-investigative noncritical and nonadversarial stage. It would seem, and for obvious reasons, that the right to an attorney expressly provided in the sixth amendment would be paramount in the post-indictment lineup critical adversarial stage. Moreover, for there to be a valid waiver of counsel, there must first be a complete admonition to the defendant of his right to counsel and the consequences of asserting or relinquishing the right and then a knowledgeable and voluntary waiver of the right. Neither of these essential ingredients was present in the case at bar and therefore there was no valid waiver by the defendant of his right to counsel at the lineup.

The trial court relied on *People v. Redmond* (1980), 85 Ill. App. 3d 599, 407 N.E.2d 132, as authority for denying the defendant's suppression motion in the case at bar. That reliance was misplaced. *Redmond* is not analogous. Unlike the case at bar, in *Redmond,* immediately prior to the lineup, the defendant spoke to an investigator from the public defender's office but did not ask him "or any other official in the vicinity, to provide him with counsel at that time." In the case at bar the defendant was unable to and did not talk with anyone from the public defender's office prior to the lineup and the defendant *did* request counsel's presence and representation at the lineup. *Redmond* is inapplicable.

The following language of *People v. Swift* (1980), 91 Ill. App. 3d 361, 364, 414 N.E.2d 895, is more appropriate to the instant case:

"In the instant case at the time of the lineup, defendant had been formally charged with robbery and aggravated battery. Therefore, the *per se* exclusionary rule announced in *Gilbert* is applicable to the situation before us. Defendant was placed in a lineup and identified without the benefit of counsel. Therefore any testimony regarding this identification must be suppressed.

The State concedes the defendant had the right to counsel but contends the defendant waived it. The State argues that defendant had been informed of his right to counsel and since he failed to request counsel he waived this right. We disagree.

Waiver is the voluntary relinquishment of a known right. The State had the burden of proving the defendant waived his right to counsel and we believe the State has failed to meet this burden."

In the case at bar the State failed to meet its burden of proving that the defendant voluntarily relinquished a known right to counsel at the post-indictment lineup, and the trial court erred in denying his motion to suppress his uncounseled lineup identification.

The State contends that Biana Castile's in-court identification of the defendant had an independent source. The State further contends that the admission of Castile's lineup identification testimony of the defendant at the defendant's trial was harmless error beyond a reasonable doubt.

The trial evidence established that Reggie Brownlee and Lisa Kennedy were shot to death in their third-floor apartment at 7002 South Harper in Chicago, Illinois. Lynn Rogers, who also lived in the building, testified that on May 30, 1983, at approximately 1 a.m. she went to Lisa Kennedy's third-floor apartment to give her some cigarettes. While Lynn Rogers was in Kennedy's apartment, the defendant, David Bailey, and Reggie Brownlee, the deceased, entered the apartment. Lynn Rogers testified that the defendant and Reggie Brownlee were angrily arguing over the quality of drugs that Reggie Brownlee had earlier sold the defendant and that during the argument Reggie Brownlee accused the defendant of having burglarized his apartment. As Lynn Rogers left the apartment, the defendant and Reggie Brownlee were still arguing. Lynn Rogers testified further that as she left Lisa Kennedy's apartment, she saw Angela White, who also lived in the building, fire a gun from her apartment rear door.

Angela White testified that she fired her .22 caliber revolver to test it and that the discharge cartridge casings had a "u" marking on the bottom. White stated that after she had fired her gun, the defendant came to her apartment and told White that the police had been called because she had shot her gun. White further related that the defendant told her to give him her gun to hide. White gave the defendant the revolver that she had fired from the rear door and a .22 caliber carbine.

At about 1 a.m. Chicago police officer Eric Thompson went to the

apartment of Reggie Brownlee. Brownlee told Officer Thompson that someone had been shooting at his apartment and directed officer Thompson to Angela White's apartment. Thompson, accompanied by Reggie Brownlee, went to Angela White's apartment and there Reggie Brownlee accused Angela White's husband and another man of burglarizing his apartment, which prompted a heated argument. Officer Thompson directed Reggie Brownlee to return to his apartment.

After Officer Thompson left, the defendant returned to Angela White's apartment. He did not return White's .22 caliber revolver and carbine which White had given him earlier to hide in anticipation of the arrival of the police. The defendant told Christopher Thomas that Reggie Brownlee had accused the defendant of a theft. The defendant and Christopher Thomas left Angela White's apartment, entered another entrance of the apartment building and went up the stairs. Thomas stopped at the second floor but the defendant went to the third floor, on which Reggie Brownlee and Lisa Kennedy lived. Thomas heard the defendant knock on Brownlee's apartment door and when a voice asked who it was, the defendant answered, "Its Chico," and the apartment door opened. Thomas stated that he sat on the second-floor landing and after a few moments he heard several gunshots. Thomas related that he became frightened and fled down the stairs and that the defendant ran down the stairs behind him.

Lily Burton, Reggie Brownlee and Lisa Kennedy's next-door neighbor, testified, by stipulation, that about 1:20 a.m. on May 30, 1983, she heard someone knock on Reggie Brownlee's door and that a male voice said that it was "Chico" or "Cochese." Thereafter, Burton heard gunshots and someone run down the stairs.

Angela White, Lynn Rogers and Christopher Thomas all testified that the defendant, David Bailey, often referred to himself as "Chico."

Tanee Pittman, a seven-year-old cousin of the deceased Lisa Kennedy, testified that she spent the night of the homicide with Kennedy in Kennedy's apartment, that she was asleep on the couch when she was awakened by two men fighting. She heard gunshots and saw a man run out the front door. Tanee Pittman was unable to identify the defendant at trial. Nevertheless, during the trial she identified a photo of the defendant and placed an "X" over the defendant's face in the defendant's lineup photograph and testified that the man (defendant) in the photo was the man she saw fighting in Lisa Kennedy's apartment before the shots were fired.

Biana Castile testified that she was visiting friends on the first floor at 7002 South Harper on May 30, 1983, when at approximately

1:20 a.m. she heard several gunshots. She looked through a hole in the door and saw two men, one with a pistol in his hand, run down the stairs. Castile stated that "Cochese," the defendant, to whom she had been introduced and knew by the nickname "Cochese" and had seen two or three times previously, was the man whom she saw running down the stairs with a gun in his hand. In the witness quarters of the Cook County jail, on June 8, 1983, Castile identified the defendant in a lineup as the man she observed running down the stairs with a gun in his hand. Additionally, Castile identified the lineup picture, People's exhibit No. 1, and identified and placed an "X" over the defendant's picture.

Chicago police detective Catherine Reardon also testified that in her presence Biana Castile identified the defendant in a lineup on June 8, 1983, at the Cook County jail as the man she saw on May 30 at approximately 1:20 a.m. run down the stairs with a gun in his hand. Reardon also identified the lineup photograph, People's exhibit No. 1, and pointed out the defendant pictured therein as the individual Biana Castile identified in the lineup.

Officer Eric Thompson testified that he returned to the Brownlee-Kennedy apartment and found them both shot. He recovered several spent .22 caliber shell casings in the apartment and Angela White testified that these casings bore the same "u" symbol that she previously observed on the casings when she fired the gun earlier.

From the foregoing testimony, the State urges that Biana Castile's in-court identification had an independent source and that the admission of the lineup identification testimony was harmless error beyond a reasonable doubt.

In *United States v. Wade* (1966), 388 U.S. 218, 240, 18 L. Ed. 2d 1149, 1164, 87 S. Ct. 1926, 1939, the Supreme Court vacated the judgment and remanded the case to give "the Government the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." The Supreme Court further stated in *Wade* that "the appropriate procedure to be followed is to vacate the conviction pending a hearing to determine whether the in-court identification had an independent source, or whether, in any event, the introduction of the [lineup] evidence was harmless error." 388 U.S. 218, 242, 18 L. Ed. 2d 1149, 1166, 87 S. Ct. 1926, 1940.

In *Gilbert v. California* (1967), 388 U.S. 263, 272, 18 L. Ed. 2d 1178, 1186, 87 S. Ct. 1951, 1956, the Supreme Court held that "The admission of the in-court identifications without first determining that they were not tainted by the illegal lineup but were of independent

origin was constitutional error." The Supreme Court further stated in *Gilbert*: "[U]nless the California Supreme Court is 'able to declare a belief that it was harmless beyond a reasonable doubt' [citation], Gilbert will be entitled on remand to a new trial \*\*\*." 388 U.S. 263, 274, 18 L. Ed. 2d 1178, 1187, 87 S. Ct. 1951, 1957.

In *People v. Curtis* (1986), 113 Ill. 2d 136, 147, 497 N.E.2d 1004, the supreme court held that an independent-basis determination can be made by a reviewing court where the record permits an informed judgment and where the reviewing court finds a sufficient alternative foundation for the in-court identification.

 In the case at bar as in *Curtis*, the record allows an informed judgment and demonstrates that Biana Castile's in-court identification of the defendant was based on her prior acquaintance with the defendant, her knowledge that his nickname was "Chico," her seeing him prior to the commission of the murders and her observation of him as he fled down the stairs from the Brownlee-Kennedy third-floor apartment after Castile heard the shots. An independent-basis determination from the record in the case at bar permits the informed judgment that Castile's in-court identification was not based on her observation of the defendant at the uncounseled lineup, but was from an independent origin. We conclude therefore that admission of the testimony of Biana Castile's lineup identification of the defendant was harmless beyond a reasonable doubt. *Gilbert v. California* (1967), 388 U.S. 263, 274, 18 L. Ed. 2d 1178, 1187, 87 S. Ct. 1951, 1957.

Tanee Pittman, the seven-year-old visitor in the deceased's apartment on the night of the murders, did not identify the defendant in court as the person she saw fighting in the apartment. She identified the defendant from a photograph taken of the lineup. The defendant's lineup picture was a derivative of the defendant's illegal lineup and therefore Tanee Pittman's testimony thereon was improperly admitted. Considering the other overwhelming evidence against the defendant, we are of the opinion that Pittman's identification testimony of the defendant's lineup photograph was harmless beyond a reasonable doubt. (*Gilbert v. California* (1966), 388 U.S. 263, 274, 18 L. Ed. 2d 1178, 1187, 87 S. Ct. 1951, 1957.) It is clear beyond a reasonable doubt that the defendant would have been convicted absent the admission of Castile's lineup identification testimony and Pittman's lineup picture identification testimony. *People v. Curtis* (1986), 113 Ill. 2d 136, 153, 497 N.E.2d 1004.

Based on the evidence set forth above, we find the defendant's contention that the evidence failed to establish his guilt beyond a reasonable doubt to be totally without merit.

■ We likewise find meritless the defendant's contention that the mandatory life imprisonment provision for multiple murder (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c)) is an unconstitutional usurpation of judicial powers. This contention was rejected by the supreme court in *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059. We reject the defendant's further contention that the mandatory life imprisonment provision of the statute was a seizure of an inherent judicial power to determine sentence, or that it is a violation of the constitutional provisions for separation of powers under article 2, section 1, of the Illinois Constitution. We also reject the defendant's contention that this statute violates the mandate of article 1, section 11, of the Illinois Constitution that penalties shall be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. We conclude that the defendant's other contentions of the unconstitutionality of the statute are unworthy of mention.

The judgments of convictions are affirmed.

Affirmed.

SULLIVAN, P.J., concurs.

## APPENDIX I

The lineup right-to-counsel admonitions given the defendant:

"Q. Did you have an opportunity, Detective Pochordo, to question David Bailey at that time concerning whether or not he had retained a lawyer?

A. Yes, I did.

Q. Specifically, what did you ask him?

A. Initially, I asked him if he was presently being represented by an attorney, and he stated no, he was not.

Q. Did you ask him if he had been recently represented by an attorney at any court proceedings?

A. Yes, he stated he had been represented by an attorney in Branch 66, I believe, in a hearing on the 31st of May, but he had subsequently fired that attorney.

Q. He told you that at the time you were talking to him, that attorney no longer worked for him, that he had fired him, is that right?

A. That is correct.

Q. Did you ask him anything else concerning that attorney and that lineup that day?

A. I asked him if he would want that attorney to be present during that lineup, and he stated no, he did not.

Q. When you refer to that attorney, you were referring to the attorney he just told you he had fired?

A. Yes, he was the last attorney of record.

Q. How did he respond when you asked him if he'd like to have an attorney that he had just fired to come to the lineup that day?

A. He stated he definitely did not want him there.

Q. Did you have an opportunity, Detective Pochordo, to ask him if he wished to hire another private attorney?

A. Yes, I did. He stated his family was in the process of securing the services of an attorney, but that that would be later, sometime during the end of the week or the following week.

Q. Did you ask him whether or not he wished to have that attorney, meaning the attorney his family was going to hire later in the week, present for that lineup?

A. No, because he stated the attorney had not been hired as of that time.

Q. Did you question him in any way, did you ask him any further questions concerning whether or not he wanted an attorney for that lineup on that day, June 8th?

A. Not so much in question form, but I told him I would notify the Cook County Public Defender's Office and advise them of the situation at the jail and have someone from their office present to represent him during the lineup.

Q. What did David Bailey tell you after you told him you would notify the Cook County Public Defender's Office and ask them to send over an attorney?

A. He stated he did not want them present and he did not want them to represent him.

Q. By them, he was referring—

A. The public defender."

## APPENDIX II

Direct examination of the defendant on the public defender as his lawyer:

"Q. Did you ask to have an attorney present at the lineup?

A. Yes, sir.

MR. GILLESPIE: I'm sorry, I didn't hear that.

THE WITNESS: Yes, sir.

MR. GILLESPIE: Thank you.

MR. BADESCH: Was there some discussion about the public defender coming to represent you for this lineup?

A. Not actually, not actually.

Q. Did Detective Pochordo ask you whether you wanted—

MR. GILLESPIE: Objection.

THE COURT: Basis?

MR. GILLESPIE: Leading.

THE COURT: Overruled.

MR. BADESCH: Did Detective Pochordo ask you whether you wanted a public defender to be present for your lineup?

A. No, he didn't.

Q. Who brought up the subject of the public defender being called to come in for your lineup?

MR. GILLESPIE: Overruled, if you know. Sustained. Lay a proper foundation.

MR. BADESCH: Were you aware of the fact that the public defender was called?

A. No, sir.

Q. Had you requested that some lawyer be present for the lineup?

A. Yes, sir.

Q. When did you make that request, if you can estimate the time, about when did you make that request?

A. I'd say about, about 45 minutes after ten, or maybe 50.

Q. Are you aware of the fact that someone then called the public defender's office to check the availability of a lawyer?

A. I mean, I didn't bear witness to this here, but this is what I was told by the investigator.

Q. The sheriff's investigator came to get you?

A. Yes, sir.

Q. Did that man tell you they called to see if the public defender was available?

A. Yes, sir.

Q. That was about ten minutes before the lineup itself occurred?

A. I'd say about six, seven minutes, sir.

Q. And then there was a lineup, is that correct?

A. Yes, sir."

JUSTICE LORENZ, specially concurring:

I would not disturb the trial court's determination that this defendant waived his right to counsel at the lineup. I believe that in

overturning the trial court's determination of this issue the majority has substituted its judgment for that of the trier of fact on the credibility of witnesses. That is not our function. (*People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182; *People v. Nims* (1986), 156 Ill. App. 3d 115, 124, 505 N.E.2d 670, 675 (Lorenz, J., specially concurring).) Accordingly, I do not join in any of the majority's extended discussion of this issue. I do however concur in the resolution of the remaining issues and therefore I join in affirming the judgment of the trial court.