(No. 61819.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JAMES CURTIS et al., Appellees.

*Opinion filed June 20, 1986.—Rehearing denied September 26, 1986.*

GOLDENHERSH, J., dissenting.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry, Thomas V. Gainer, Mary Pat Butler and Mary E. Shields, Assistant State's Attorneys, of counsel), for the People.

Wilson Frost and James L. Hardemon, of Chicago, for appellee James Curtis.

Patrick A. Tuite and Brent D. Stratton, of Patrick A.

140

Tuite, Ltd., of Chicago, for appellee Andrew Ryder.

JUSTICE SIMON delivered the opinion of the court:

Defendants, James Curtis and Andrew Ryder, were convicted in a bench trial in the circuit court of Cook County of armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2). The appellate court reversed the convictions and remanded for a new trial. (132 Ill. App. 3d 241.) We allowed the State's petition for leave to appeal (94 Ill. 2d R. 315).

On July 18, 1979, two men entered a liquor store on the south side of Chicago shortly before closing time. After pretending to inspect the merchandise, they announced a stickup. Four store employees, manager Thomas Buckle, cashier Rosalind Harris, stock man Greg Webb, and part-time security guard Fred Kinnie, were present at the time. One robber put a gun in Kinnie's back, then removed Kinnie's gun from its holster, unloaded it, threw the shells over a rack, and returned the gun to the holster. He continued to stand near Kinnie throughout the incident. The second robber ordered the other three employees to the back of the store. He told Harris and Webb to face the back door and then forced Buckle to lead him through the store to an office desk containing money, the safe, and the cash registers. After taking money from the desk and the registers (the safe could not be opened), that robber placed Buckle, Harris, and Webb in a storage room, and his partner did the same with Kinnie. With orders to the employees not to emerge for at least 15 minutes, the offenders fled. The incident had lasted somewhere between 15 and 30 minutes.

Some 19 months later, in February 1981, Richard Julien, an inspector with the internal affairs division of the Chicago fire department, learned that defendant Ryder, a fire department captain also with the internal affairs

division, might have been involved in the liquor store robbery. This intelligence came from another fire department investigator who was a friend of the liquor store security guard, Fred Kinnie; Kinnie was also employed by the fire department at the time. Julien presented a photographic array to store manager Buckle which included Ryder's picture. After Buckle made a tentative identification of Ryder, Julien brought the allegations to the attention of the police department.

Police officers subsequently showed a photo spread including defendant Ryder to witnesses Buckle and Harris. Both witnesses made tentative identifications of Ryder. The witnesses were also shown a spread which included a picture of defendant Curtis. Although the record does not disclose why suspicion had focused on Curtis, it is likely that the allegations against him originated with Kinnie. With respect to Curtis the evidence is in conflict, but it appears that any identification of Curtis at that point was at best tentative.

A week later, on February 17, 1981, Kinnie made a statement to police officers and an assistant State's Attorney naming the defendants as the two robbers and implicating himself as an "inside man" in the robbery. Later the same day, store manager Buckle swore out complaints against Curtis and Ryder; a circuit judge found there was probable cause for filing the complaints and issued warrants for their arrest. Within several hours of being arrested, each defendant stood in two lineups, one viewed by Buckle and the other by liquor store employee Greg Webb. Neither defendant was represented by counsel at the lineups. Buckle identified both defendants in the lineups. The record is not clear on whether Webb made any identification, but he was never called to testify. Several days later Harris was shown photographs of the defendants' lineups and identified both Curtis and Ryder.

Trial of the case occurred approximately 2½ years after the arrests. Prior to trial, the circuit judge suppressed Buckle's lineup identification of Ryder on the ground that Ryder's sixth amendment right to counsel at the lineup had been violated; however, Buckle's lineup identification of defendant Curtis was not suppressed because the judge found that Curtis had waived his sixth amendment right.

At trial the evidence against the defendants consisted of the testimony of Buckle, Harris, and Kinnie. The State's case included in-court identifications by Buckle and Harris of each defendant, Buckle's identification of Curtis at the lineup, and Harris' identification of both defendants from lineup photographs. In addition, both witnesses testified to making tentative identifications from the prelineup photo arrays. Kinnie repeated his story that he had collaborated in the robbery with the two defendants.

The appellate court agreed with the trial court that the defendants' sixth amendment right to counsel attached upon the filing of criminal complaints and that the defendants were therefore entitled to have attorneys present at the lineups. The appellate court held, however, that the trial judge's finding that Curtis had waived the right was against the manifest weight of the evidence and that Curtis, like Ryder, was entitled to suppression of Buckle's lineup identification. Moreover, the appellate court believed that *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, and *Gilbert v. California* (1967), 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951, mandated the suppression not only of Buckle's lineup identification of the defendants, but also the in-court identifications by both witnesses and all other identification evidence. Since the only remaining evidence tying the defendants to the robbery was the testimony of Kinnie, whose credibility was sub-

ject to impeachment, the appellate court concluded that the error in admitting the identifications was not harmless and that a new trial was required.

We need not pass upon the propriety of the appellate court's views as to the necessity of counsel at the lineups or Curtis' alleged waiver of the right. Even assuming that the appellate court's resolution of these questions was correct, its application of the *Wade-Gilbert* exclusionary rule was erroneous. Under a correct application of the principles articulated in those cases, any error resulting from the uncounseled lineups was harmless beyond a reasonable doubt.

A lineup which is held after the initiation of "adversary judicial criminal proceedings" without the presence of counsel for the accused is unconstitutional. (*Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882.) Once it has been determined (or as here assumed) that a lineup violates the sixth amendment right to counsel, any evidence adduced by the prosecution that a witness identified the defendant at the lineup is subject to a *per se* rule of exclusion. (*Gilbert v. California* (1967), 388 U.S. 263, 273, 18 L. Ed. 2d 1178, 1186, 87 S. Ct. 1951, 1957; *Moore v. Illinois* (1977), 434 U.S. 220, 231, 54 L. Ed. 2d 424, 436, 98 S. Ct. 458, 466.) However, an *in-court* identification may be permitted even when it follows an uncounseled lineup if the State can establish by "clear and convincing evidence that the in-court identification[ ] [was] based upon observations of the suspect other than the lineup identification." (*United States v. Wade* (1967), 388 U.S. 218, 240, 18 L. Ed. 2d 1149, 1164, 87 S. Ct. 1926, 1939; see also *People v. Fox* (1971), 48 Ill. 2d 239, 245-46; *Frisco v. Blackburn* (5th Cir. 1986), 782 F.2d 1353; *United States v. Anderson* (7th Cir. 1983), 714 F. 2d 684.) If either a lineup or an in-court identification is improperly admitted, a new trial is required unless the State can prove

that the error was harmless. *Gilbert v. California* (1967), 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951.

In this case, the *Wade-Gilbert* principles must be applied to three types of evidence admitted at trial: Buckle's testimony that he identified Curtis at the lineup, Harris' testimony that she identified both defendants from pictures of the lineups, and the in-court identifications of both defendants made by Buckle and Harris.

## I. THE LINEUP IDENTIFICATION TESTIMONY

Because the trial judge granted Ryder's motion to suppress, there was no evidence presented that Buckle had picked him out of a lineup. Ryder concedes that the appellate court's contrary view of the record is mistaken. Buckle was permitted to testify, however, that he told the police at Curtis' lineup that Curtis resembled the man involved in the robbery. Assuming that the uncounseled lineup violated the defendant's sixth amendment right, *Gilbert* requires that this testimony by Buckle be excluded. (*Gilbert v. California* (1967), 388 U.S. 263, 273, 18 L. Ed. 2d 1178, 1186, 87 S. Ct. 1951, 1957.) Whether the admission of this testimony affected the outcome of the trial is considered later in this opinion.

## II. HARRIS' IDENTIFICATIONS FROM LINEUP PHOTOGRAPHS

The defendants argue that the pretrial identifications made by Harris from photographs of the lineups are direct fruits of the allegedly unconstitutional lineups and that her testimony as to those identifications was therefore not admissible. As the defendants see it, by using the lineup photographs in this way the State can circumvent the exclusionary rule laid down in *Gilbert* and make the trier of fact aware that an accused was picked out of a lineup. The State responds that these pictures of the

lineups, like other photos shown by the police to witnesses, may be utilized without the the presence of counsel for the accused.

A *per se* rule excluding testimony that the accused was identified at an uncounseled lineup may be the only "effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup." (*Gilbert v. California* (1967), 388 U.S. 263, 273, 18 L. Ed. 2d 1178, 1186, 87 S. Ct. 1951, 1957.) By contrast, when the testimony concerns only an identification from a picture of the lineup, exclusion is not critical to effectuating the sixth amendment right. Since in-person lineup identifications are more accurate (*Simmons v. United States* (1968), 390 U.S. 377, 386 n.6, 19 L. Ed. 2d 1247, 1254 n.6, 88 S. Ct. 967, 972 n.6) and therefore more probative than photographic identifications, the police and the prosecution are unlikely to attempt to undercut the right to counsel by routinely foregoing the witness' actual presence in favor of merely showing the witness a picture of a simulated lineup.

Although the photographs here were taken at lineups, Harris' testimony was not " 'come at by exploitation of [the primary] illegality' " (*Gilbert v. California* (1967), 388 U.S. 263, 273, 18 L. Ed. 2d 1178, 1186, 87 S. Ct. 1951, 1957, quoting *Wong Sun v. United States* (1963), 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417). The primary illegality was allowing Buckle to make lineup identifications in the absence of counsel for the defendants. That illegality was irrelevant to Harris' later identification of the defendants from the photographs. From the viewpoint of Harris' identifications, the lineup photographs were no different than any other pictures or arrays of multiple suspects which the police could have constructed. The State can clearly obtain and use pictures of suspects without their lawyers being present,

and we see no difference of constitutional magnitude between a single picture of several persons standing together and individual pictures of each. See *People v. Lawrence* (1971), 4 Cal. 3d 273, 481 P.2d 212, 93 Cal. Rptr. 204.

Moreover, defendants offer no suggestion as to how their lawyers' presence at the lineups could have aided them at trial with regard to Harris' identifications from the photographs; the attorneys' ability to cross-examine the witness would not have been any greater if they had been present when the lineup pictures were taken. (*Cf. United States v. Ash* (1973), 413 U.S. 300, 312-13, 37 L. Ed. 2d 619, 628, 93 S. Ct. 2568, 2575.) It should also be noted that defendant Ryder's concern that the trier of fact was indirectly apprised of the suppressed lineup through Harris' testimony is somewhat disingenuous where, as here, the case was tried by the judge who also presided at the suppression hearing. We conclude that the trial judge did not err in permitting Harris to testify to her identifications from the lineup photographs.

### III. THE IN-COURT IDENTIFICATIONS

The appellate court decided that the in-court identifications of the defendants by Buckle and Harris had to be excluded whether or not those identifications had a source independent of the uncounseled lineups because, the court reasoned, the in-court identifications were tainted by references to the lineup and lineup photographs. This conclusion misreads the Supreme Court's decision in *Gilbert*; there the court explicitly held that while testimony concerning the uncounseled lineup identifications had to be excluded, the in-court identifications could be admitted if the State established by clear and convincing evidence that they had an independent basis. *Gilbert v. California* (1967), 388 U.S. 263, 272-73, 18 L. Ed. 2d 1178, 1186, 87 S. Ct. 1951, 1956-57.

In this case, the independent-basis inquiry need only be undertaken with respect to Buckle's in-court identifications since the question only arises when an unconstitutional pretrial identification intervenes between the crime and the in-court testimony. In view of our conclusion that Harris' identifications from the lineup photographs were constitutionally unobjectionable, it follows that her in-court identifications were properly admitted.

To decide whether Buckle's in-court identifications had an origin independent of the uncounseled lineups, several factors must be considered, including "the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification." *United States v. Wade* (1967), 388 U.S. 218, 241, 18 L. Ed. 2d 1149, 1165, 87 S. Ct. 1926, 1940.

The independent-basis determination can be made by a reviewing court where the record permits an informed judgment (*United States v. Anderson* (7th Cir. 1983), 714 F.2d 684, 687; *People v. Davis* (1970), 45 Ill. 2d 514, 517; see, *e.g., People v. McDonald* (1975), 62 Ill. 2d 448; *People v. Fox* (1971), 48 Ill. 2d 239), and the court may find a sufficient alternative foundation for the in-court identification "even where a small number of these factors are present." (*United States v. Anderson* (7th Cir. 1983), 714 F.2d 684, 686.) The record in this case allows an informed judgment, and evaluation of the *Wade* factors demonstrates convincingly that Buckle's in-court identifications were based on his observations during the robbery, not on seeing the defendants at the uncounseled lineups.

The first *Wade* factor, the opportunity to observe the

incident, strongly suggests an independent basis for the identifications. Between 15 and 30 minutes elapsed from the time the robbers entered the store to the time they shut the employees in the storage room. There was excellent fluorescent lighting throughout the store. Although Buckle was not able to view either perpetrator for the entire time, he had ample opportunity to see both. Buckle observed both looking at merchandise and asked the person he later identified as Ryder whether he could help him. At that point, Buckle and Ryder were standing "toe to toe." He was also able to see Ryder from 20 feet away when Ryder pulled a gun on Kinnie, and later when he walked to the front of the store where the cash registers were located.

Buckle's chance to view the other robber was only slightly more limited. After the robbers announced a stickup, the person Buckle identified as Curtis put a gun to his back and followed him first to the back of the store and then to the various places where money was kept. However, Buckle did see Curtis before the robbery was announced, as well as when Curtis subsequently stood between Buckle and the other employees holding a gun on them. He testified that he had occasion to confront Curtis face to face.

The descriptions of the two robbers which Buckle gave to the police closely matched the defendants' actual descriptions. Buckle told the police that one of the robbers was a white male in his fifties, five-eleven or six feet in height, heavyset (by which he testified that he meant 200 to 210 pounds), with gray or salt-and-pepper hair. At the time of his arrest 19 months later, Ryder was 55 years old, six feet tall, weighed 200 pounds, and had gray hair. Buckle's description of the other suspect was that he was black, approximately six feet tall, weighed 215 pounds and had slightly reddish hair. According to the arrest report, Curtis is black, six-two,

weighs 230 pounds, and has brown hair. The contention by defendants that these descriptions were too vague to be useful is plainly without merit. At issue is not whether the witness has offered a description which points only to the accused but whether significant discrepancies existed between the actual descriptions and those initially given to the police. Although tape-measure accuracy is not required, that is essentially what Buckle provided. No substantial discrepancy existed between the descriptions.

The next three *Wade* factors concern prelineup identifications by the witness. An in-court identification is more likely to have a source independent of an uncounseled lineup if the witness identified the defendant on a prior occasion, never identified anyone else, and never failed to identify the defendant when given the opportunity to make an identification.

Buckle was first presented with an array of 10 pictures, including one of Ryder, by the fire department inspector. Buckle initially selected Ryder's picture, saying something to the effect of "this looks like the man." Although he subsequently chose two other pictures as possibilities, Buckle was more positive about Ryder's picture. Buckle later made a tentative identification of Ryder from an array of five photos presented to him by police officers, adding that he would have to see Ryder in person to be sure.

Ryder contends that Buckle's failure to make a positive identification prior to the lineup demonstrates that no independent source for the in-court identification existed. This argument ignores the limitation of photographic identifications: as defense counsel himself brought out on cross-examination, at least part of Buckle's uncertainty resulted from the fact that he could not determine the defendant's height and weight from the pictures. While the witness' degree of certainty in mak-

ing the photographic identification is relevant, the lack of certainty does not overcome the fact that Buckle in fact chose Ryder's picture at both opportunities he had to make the identification.

It is true that Buckle tentatively selected two other possible suspects (of which he was less positive than Ryder) from the photo array presented to him by the fire department inspector. Although this fact is entitled to some weight, on balance we believe that Buckle's pre-lineup identifications of Ryder indicate that he would have been able to identify Ryder in court even if no lineup had been held.

Buckle saw only one photo array of possible black suspects, and there is some dispute whether he was able to identify Curtis' picture. Buckle testified that he told the police that the picture of Curtis "resembled" the robber. However, an officer called at the suppression hearing stated that to the best of his recollection Buckle made no identification from the photographs and noted that the picture of Curtis was taken some four years before the robbery and was blurred. Buckle did not identify anyone else in the array. In light of the conflicting evidence and the defects of the photograph used, the prelineup identification factors neither favor nor negate the independence of the in-court identification in Curtis' case.

The final *Wade* factor, upon which the defendants principally rely, is the lapse of time between the incident and the lineup. In this case, the lineup was held 19 months after the robbery; clearly the delay here is a "seriously negative factor" (*Neil v. Biggers* (1972), 409 U.S. 188, 201, 34 L. Ed. 2d 401, 412, 93 S. Ct. 375, 383). However, we do not think it is a dispositive one, especially considering the excellent opportunity which Buckle had to observe the crime and the accuracy of his descriptions of the suspects. Defendants in effect urge

us to announce a rule that an in-court identification can never be independent of a lineup which occurs a significant time after the event. Our experience rejects such a rule. We conclude that a balancing of the *Wade* factors demonstrates that Buckle's in-court identifications were based on his observations at the time of the robbery, not what he saw at the lineups. Thus, his in-court identifications of both defendants were admissible.

## IV. HARMLESS-ERROR INQUIRY

We have concluded that none of the evidence adduced against Ryder at trial resulted from or was tainted by the uncounseled lineup identification. Any error in permitting the lineup to be held in the absence of his lawyer was therefore harmless beyond a reasonable doubt, and his conviction must be affirmed. (See *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) With respect to Curtis a more detailed inquiry is required since, assuming that a sixth amendment violation occurred, the court improperly allowed Buckle to testify that he identified Curtis at the lineup.

Excluding the lineup testimony, the principal evidence against Curtis consisted of the remaining identifications—Harris' identification from the lineup photograph and both witnesses' in-court identifications—and Kinnie's testimony that he, Curtis and Ryder executed the robbery. The in-court identifications of both witnesses were positive, and the record demonstrates that both witnesses had a sufficient opportunity to observe Curtis during the robbery. Several days before identifying Curtis from the lineup photograph, Harris saw a newspaper story concerning the robbery. The story included pictures of the defendants, but no claim has been made that the identification from the lineup photograph was thereby rendered impermissibly suggestive, and that identification was properly considered.

Kinnie testified that he had known Ryder for at least 10 years and Curtis for about six. On Ryder's initiative, Kinnie and Ryder discussed robbing the liquor store in early July 1979. Sometime thereafter Kinnie and Ryder had a phone conversation in which Ryder advised Kinnie that Curtis would be involved in the robbery. On July 18, the day of the robbery, Ryder called Kinnie at the liquor store to inform Kinnie that he was coming over that day. At four o'clock Ryder entered the store, made a small purchase, and left. Kinnie followed him to the parking lot, and Ryder told him that it looked all right and that he would talk to Curtis. Several hours later Curtis appeared at the store, also bought something, and spoke with Kinnie in the parking lot. Apparently the only advance planning among the three was that the defendants would take Kinnie's gun and that the robbery would take place at closing time. The robbery occurred at approximately 10 p.m., and Kinnie's version of the incident was consistent in all relevant details with those given by Buckle and Harris. After talking with the police who came to investigate the robbery, Kinnie went directly to Curtis' house, where he split the money with the defendants. The record reflects that Kinnie's testimony as to Curtis' address was accurate.

Of course, both Kinnie's integrity and his motive in testifying were open to question. Kinnie, already on Federal probation for a felony at the time of trial, testified in exchange for an agreement with the State on the armed-robbery charge as well as several other outstanding charges. He admitted to committing deceptive practices. Also, at the time Kinnie confessed to the police in February 1981, he knew that the fire department's internal affairs division, including Ryder, was investigating him for stealing money from dead persons in ambulances while working as an emergency medical technician. However, Kinnie's credibility need not be judged in a vac-

uum; his statements and the eyewitness accounts and identifications were mutually corroborative. In addition, Kinnie's testimony explains the peculiar fact mentioned by both witnesses that his gun was returned to him after Ryder removed the shells. Kinnie's story also explains why he was separated from the other employees while the robbery was in progress.

In its harmless-error analysis, the appellate court noted that the State never called Greg Webb, who was the other witness to the robbery. His absence is not relevant since there is nothing to show that the defendants could not have called Webb had they desired to do so.

This is not a case in which the prosecution has repeatedly emphasized an improper lineup identification rendering that evidence "pivotal" to the conviction. (*Cf. Frisco v. Blackburn* (5th Cir. 1986), 782 F.2d 1353, 1356.) That identification was only mentioned once during Buckle's direct examination and not at all in closing argument. Considering the other evidence against Curtis, it is clear beyond a reasonable doubt that he would have been convicted even absent the admission of Buckle's lineup identification. We are therefore persuaded that any error was harmless.

The judgment of the appellate court is reversed, and the convictions of both defendants are affirmed.

*Appellate court reversed; circuit court affirmed.*

JUSTICE GOLDENHERSH, dissenting:

I dissent. I agree with the majority opinion of the appellate court and would remand the cause for a new trial.

The majority concedes that the suppression of Buckle's lineup identification of Ryder was proper and disposes of the question whether Buckle's lineup identification of Curtis should also have been suppressed by

holding that the error, if any, was harmless. It condones the use of a photograph of the lineup, admittedly unconstitutional (*Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882), as the basis of the identification of defendants by the witness Harris. No reason is shown for Harris' failure to attend one of the lineups or why another could not have been arranged. Concerning the use of photographs under these circumstances, this court said in *People v. Kubat* (1983), 94 Ill. 2d 437:

> "There is, of course, no constitutional impediment to the use of photographs in the initial identification, despite the recognition that there is a risk of misidentification when the procedures are improperly employed. (*Simmons v. United States* (1968), 390 U.S. 377, 385-86, 19 L. Ed. 2d 1247, 1254, 88 S. Ct. 967, 972.) When properly used, this technique 'is indispensable in the investigatory phase of a criminal case.' (*People v. Jackson* (1973), 54 Ill. 2d 143, 147.) When a suspect is in custody, however, and a lineup is otherwise feasible, this court has generally disapproved of the use of photographs as a basis of identification, absent extenuating circumstances justifying their use. *People v. Williams* (1975), 60 Ill. 2d 1, 9; *People v. Jackson* (1973), 54 Ill. 2d 143, 147-48; *People v. Holiday* (1970), 47 Ill. 2d 300, 306-07." 94 Ill. 2d 437, 471.

There are no "extenuating circumstances" shown here, and there is no justification for the use of the photograph in making the identification.

The majority recognizes that an in-court identification which follows an uncounseled lineup may not be admitted unless the State can establish by clear and convincing evidence that the in-court identification was based upon observations of the suspect other than the lineup identification. In my opinion the People failed to adduce such clear and convincing evidence. Buckle was hesitant in making the identification, and it was only after an examination of photos and the lineup that he did so. Fur-

thermore, defendant Ryder was the only man in the lineup whose photograph was among those submitted to Buckle before the lineup. So far as can be determined by the record, the only photo of a participant in the lineup included in the photos shown Harris was that of Curtis. The suggestive effect of including the photo of only one participant in the lineup in the array shown the witness is obvious.

The appellate court noted:

"[T]he prosecutor opportunistically elicited testimony from Buckle that he had identified defendants at the lineups, which were held in violation of defendants' constitutional rights. Moreover, the prosecutor showed Harris the lineup photographs at trial and elicited testimony from Harris that she had seen the lineup photographs on February 23, 1981, and identified defendants at that time from the lineup photographs. The lineup photographs were then admitted into evidence. Plainly, this testimony and evidence were the direct results of the unconstitutional lineups, obtained by the prosecutor's exploitation of the primary illegality." (132 Ill. App. 3d 241, 252.)

Defendants did not receive a fair trial, and the cause should be remanded in accordance with the judgment of the appellate court.