THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MAR-
CUS GONZALEZ, Defendant-Appellant.

First District (2nd Division) No. 1—92—0131

Opinion filed November 15, 1994.

McCORMICK, J., concurring in part and dissenting in part.

Rita A. Fry, Public Defender, of Chicago (Joseph M. Gump, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Marie Quinlivan Czech, and Cathy Bernard, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

At about 11:30 p.m. on July 4, 1989, Michael Vasquez, a 17-year-old reputed gang member, was found fatally shot behind 3134 S. Morgan Street in the north-south alley between 31st Place and 32nd Street in the City of Chicago. An unidentified witness told police officer James Entress that he saw Richie Maldonado, who was wearing a black cut-off sweatshirt, running from the scene shortly after the shooting. Maldonado, while denying any involvement in the shooting, told police that he had seen Michael Lovering earlier that evening wearing a black cut-off sweatshirt; Lovering is about the same height and weight as Maldonado.

At about 12:30 a.m., Entress and his partner arrived at the three-flat building where Lovering was staying with Wanda Maldonado, Richie Maldonado's sister. Entress testified that from his car in front of the three-flat, he was able to see into a third-floor living room; that he believed that he saw Lovering and two other men at the window; and that the men fled towards the rear of the apartment when they saw the police car. A resident of the apartment allowed the officers inside where they found three young men, including defendant, playing cards at the kitchen table. Defendant, who is about eight inches shorter than Richie Maldonado and Lovering, was not wearing a black cut-off sweatshirt. Entress observed a revolver and a BB gun on the bed in the bedroom about 15 feet from the kitchen. All the men denied that they owned the guns. Entress then arrested the men and two women who were also present in the apartment; the arrest was warrantless.

Defendant was subsequently charged by indictment on two counts of first-degree murder. At the hearing on defendant's motion to quash his arrest and suppress all evidence stemming from it, the court found that Entress' account of the events leading to the arrest lacked credibility, that there was no connection between defendant and the guns, and that defendant was not a suspect in the murder at the time of the arrest. Holding that the police did not have "one whit of

probable cause to arrest the defendant," the court granted the motion.

The State then filed an attenuation motion, arguing that certain evidence obtained while defendant was under arrest should be admissible. At the hearing on the motion, Officer Fred McKinley testified that defendant and Maldonado participated in a lineup in the early morning hours of July 5, 1989. After the lineup, defendant was placed in an interview room and Maldonado was returned to a temporary cage. McKinley testified that at about 3 a.m., Maldonado told him that before the lineup defendant had confessed to the shooting.

McKinley then interviewed defendant after first advising him of his *Miranda* rights. Initially, McKinley testified that he informed defendant in the presence of the other participants that he had been identified in the lineup; later he stated that he did not tell defendant that he had been identified until after he had been brought to the interview room. While detained in the interview room, defendant signed a confession in the presence of an assistant State's Attorney. Upon questioning by the court, McKinley conceded that Maldonado was not known to the police as a reliable informant, and that at the time of the lineup, he was the only suspect in the shooting investigation. However, McKinley asserted that Maldonado knew that he had not been picked out of the lineup and that he was no longer a suspect before he revealed that defendant had confessed to him.

The State argued that the lineup identification of defendant, his conversation with Maldonado, and his subsequent confession were intervening factors which sufficiently purged the taint of the illegal arrest, and therefore, should not be suppressed. However, because there was no direct testimony that defendant had been identified in the lineup and McKinley's testimony was contradictory, the court denied the State's motion for attenuation and ruled that the motion to quash arrest and suppress evidence remained in full effect.

Defendant filed a motion *in limine* seeking to suppress the testimony of Enrique Hernandez on the ground that the State discovered him through defendant's illegally obtained confession and that it failed to show that it would have discovered Hernandez through independent investigation. The court denied the motion, and although defendant renewed the motion at the commencement of his bench trial, the court again denied it.

At trial, Arthur Julian testified that he was sitting on a neighbor's porch on South Morgan at about 11:30 on the night of July 4, 1989, when he saw the victim walk from a parking lot into the alley that runs between "31st and 32nd Streets [*sic*]." He then

saw two people enter the alley from "31st Street [sic]" walking south, towards him, as the victim walked away from him, towards "31st Street [sic]." Julian testified that defendant said something to the victim, at which time the victim raised his arms approximately parallel with his shoulders. Julian recalled that defendant then knelt on his right knee and held an object in his extended right hand; Julian could not identify the object as a gun. He then heard what sounded like fireworks and saw the victim fall. Julian estimated that defendant was about 100 feet from him when he saw him crouch down. Julian testified that at first he did not recognize defendant, but later he recognized him "[i]n a lineup." He stated that although he had never met or spoken with defendant, he had seen him about four times "in the projects," the most recent occasion being one week prior to the shooting.

On cross-examination, Julian admitted that he had told the grand jury that he viewed the shooting from his porch, not a neighbor's porch; nonetheless, he insisted at trial that he witnessed the shooting from his neighbor's porch. Upon further questioning, he indicated that he was not sitting on Morgan Street; rather, he was four houses off Morgan on 32nd Street where he had a view of the alley "[f]rom 32nd to 31st [sic]."

In response to defense counsel's question regarding whether anyone had shown him a picture of defendant before he testified, Julian responded, "[j]ust the lineup." Defense counsel then moved to strike Julian's testimony relating to his identification of defendant. The court denied the motion, stating that the photograph and the fact of the lineup were excluded, but that "there is nothing that prohibits the State's Attorney from using that outside the courtroom" in ways he "deems appropriate."

Hernandez testified against defendant, conceding that he had an unrelated murder charge pending against him and that he expected "some consideration" from the State in exchange for his testimony. He stated that at the time of the shooting, he and defendant were members of the Satan Disciples street gang. They and some other young men went to two taverns trying to buy beer, but both were closed. Hernandez recalled that he and defendant subsequently separated from the others and walked towards the alley between "31st and 32nd Streets [sic]." As they entered the alley, which was in rival gang territory, they saw the victim walking towards them. The victim threw his arms up in a gesture calling for a fight and said, "[w]hat's up pussys [sic]." Hernandez asked the victim what was "up" and he responded by putting his hands in his waistband and then on his crotch. At this point, Hernandez was about five feet in front of de-

fendant and the victim was about 10 feet away from Hernandez. He then heard a shot and saw the victim fall. Defendant and Hernandez both ran to Wanda Maldonado's apartment, where they were later arrested with the other occupants of the apartment. Shortly thereafter, Hernandez was released. He testified that while in the apartment, defendant admitted shooting the victim because "[h]e had something."

Hernandez testified that he was again arrested on July 6 when he gave a statement to the police regarding the shooting and that he testified before the grand jury the next day. Later in his testimony, he stated that he turned himself in on July 6. Officer Garza testified that Hernandez was not under arrest on July 6 when he took him to Area 3 Violent Crimes, but that he was "under investigation for a homicide." However, when defense counsel showed him his supplementary arrest report, Garza conceded that it indicated that Hernandez had been arrested.

Officer Butler testified that he took photographs of the scene on the night of the shooting and that the alley was lighted at each end and at its middle "T" section, making it possible to see from the north end of the alley through to the south end with the center illuminated by three houses each way, north and south. Officer Ostrowski also testified that the lighting illuminated the length of the alley. He stated that the victim's body was discovered about 30 feet from the "T" in the alley at 3134 South Morgan. Officer McKinley testified that the lighting conditions were poor, but that he considers all artificial lighting to be poor.

John Kringas, a professional photographer called by defendant, testified that he photographed defendant and another individual standing in the middle of the alley where the shooting occurred. Kringas took the picture at noon while at 1011 West 32nd Street, where he had a direct view down the alley, with equipment designed to record on film what the human eye could see. He stated that it would not be possible to identify defendant from the photograph he took. On cross-examination, Kringas conceded that the photographic images were not lifesize, that without using a wider angle lens he was unable to capture the full frame of what the human eye could see, and that it was possible for a person's eyesight to be more sensitive than the camera.

Defendant's final witness was Edward Carmody, who testified that the distance between where Julian testified he witnessed the shooting and the center of the alley was about 206 feet or 69 yards. He also stated that it was impossible to see through the alley from 32nd Street to 31st Street because buildings line the south side of 31st Street from the west on Morgan, and a building cuts off the view

of the alley from 1013 West 32nd Street. However, on cross-examination, Carmody acknowledged that the alley runs straight through from 32nd Street to *31st Place.*

At the close of the trial, defendant moved for a "directed finding" (whatever that means in a bench trial) which was denied. The judge found defendant guilty of second-degree murder, rather than first-degree murder, ruling that the threatening gestures made by the victim constituted mitigating circumstances. The court expressly found Julian and Hernandez credible and noted that it would be possible to identify someone you knew from 68 yards away. Defendant moved for a new trial, contending, *inter alia,* that the trial court erred in refusing to strike Julian's testimony and in permitting Hernandez to testify, but the court denied the motion and sentenced defendant to "13 years in the custody of the Illinois Department of Corrections and two years mandatory supervised release." This appeal followed.

We first address the State's motion to strike a portion of defendant's reply brief, which motion we took with the case. The State objects to defendant's attachment to his reply brief of a copy of a complaint for a preliminary examination in People v. Enrique Hernandez and a certified statement of Hernandez' conviction of second-degree murder. The complaint is dated October 8, 1989, and the statement of conviction indicates that judgment was entered on the conviction on February 20, 1992, nearly three months after defendant's conviction. Defendant included the documents to show that Hernandez received a seven-year sentence for his conviction of second-degree murder, although he was initially charged with first-degree murder. Defendant argues in his opening brief that Hernandez gave his damaging testimony in the hope that it would lead to "some consideration" from the State in his upcoming murder trial. In his reply brief, defendant implies that the reduced charge was the consideration that Hernandez expected for his testimony against defendant. The State argues that since these documents were not before the trial court in defendant's case, it was improper for him to refer to them in his reply brief and to attach copies to the brief.

■ Attachments to briefs which are not of record are not properly before the reviewing court. (*Etten v. Lane* (1985), 138 Ill. App. 3d 439, 485 N.E.2d 1177.) Supreme court rules permit supplementing the record on appeal. However, supplements to the record must contain material which was before the trial court (see *People v. Carroll* (1977), 49 Ill. App. 3d 387, 396, 364 N.E.2d 408, 414; 134 Ill. 2d R. 329), and even then, leave must be obtained from the reviewing court before they can be received. (134 Ill. 2d R. 366(a)(3).) In the case at bar, de-

fendant could in no way have supplemented the record with documents pertaining to Hernandez' conviction, an event which did not occur until after defendant's trial was over; he therefore inappropriately included them in his reply brief before this court. We thus agree with the State's argument and grant its motion to strike.

Turning now to the merits of defendant's appeal, he first argues that the trial court erred in denying his motion *in limine* to exclude Hernandez' testimony. Defendant contends that Hernandez' testimony was not sufficiently attenuated from his suppressed confession.

Under certain circumstances, live testimony should be excluded when knowledge of the witness arose from a fourth amendment violation. (See *United States v. Ceccolini* (1978), 435 U.S. 268, 55 L. Ed. 2d 268, 98 S. Ct. 1054.) In *Ceccolini*, the Supreme Court clarified its holding in *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, that oral evidence, as well as physical evidence, may be subject to the exclusionary rule. The Court reasoned that since the cost of excluding live testimony is often greater than the exclusion of documentary evidence, "a *** more direct link between the illegality and that kind of testimony is required." (*Ceccolini*, 435 U.S. at 278, 55 L. Ed. 2d at 278, 98 S. Ct. at 1061.) The Court focused on several factors in determining whether the testimonial evidence should be excluded: (1) the length of time between the illegal conduct and contact with the witness by police; (2) whether the illegal conduct was motivated by a desire to locate witnesses; (3) whether the witness was known to police before the illegal conduct; (4) whether the witness' testimony was voluntary; and (5) to what extent the "permanent disability" of the witness would hinder the search for truth. *Ceccolini*, 435 U.S. at 275-78, 55 L. Ed. 2d at 276-78, 98 S. Ct. at 1059-61; see also 4 W. LaFave, Search and Seizure § 11.4(i), at 452-57 (2d ed. 1987).

The State erroneously relies on *Michigan v. Tucker* (1974), 417 U.S. 433, 41 L. Ed. 2d 182, 94 S. Ct. 2357, for its contention that the trial court properly denied defendant's motion *in limine*. In *Tucker*, the Court held that the defendant's fifth amendment rights were not violated when he gave a statement to police without receiving full *Miranda* warnings. (*Tucker*, 417 U.S. at 445-47, 41 L. Ed. 2d at 193-94, 94 S. Ct. at 2364-65.) The police had informed the defendant of his right to an attorney, but failed to state that an attorney would be provided if he were indigent; *Miranda* had not yet been decided. While in custody, the defendant provided an alibi for the time of the offense, but, when questioned by police, his alibi witness gave inculpatory information. The defendant moved to have the witness' testimony excluded at his trial, which took place after the Court's

*Miranda* ruling, but the court denied the motion. The defendant argued on appeal that denial of his motion was erroneous since he gave his statement to police without full *Miranda* warnings. The Court disagreed, resting its analysis on three bases. First, the officers acted in good faith and in compliance with the law at the time, thereby obviating the deterrence goal of exclusion; second, a third party's statements, not the defendant's, were admitted at trial; and third, the Court characterized *Miranda* warnings as merely prophylactic measures, and thus the defendant had not been deprived of a constitutional privilege, he simply did not obtain "the full measure of procedural safeguards associated with that right." *Tucker*, 417 U.S. at 444, 41 L. Ed. 2d at 193, 94 S. Ct. at 2364.

■ In contrast, in the case at bar, the trial court found that defendant's fourth amendment rights had been directly and deliberately violated when he was arrested, leaving no room for a finding that the police acted in good faith. Furthermore, unlike *Tucker*, we cannot overlook the gravity of the constitutional violation by designating the illegal arrest a mere procedural infraction. The State contends that Hernandez' arrest on the night of the murder shows that his identity was known to the police before they illegally obtained defendant's confession. However, the arrest itself was illegal, a fact that the State does not dispute. Hernandez' arrest undoubtedly alerted him to the fact that he was a potential suspect in the homicide investigation and his subsequent statement cannot be seen as the "product of detached reflection and a desire to be cooperative." (*Ceccolini*, 435 U.S. at 277, 55 L. Ed. 2d at 277, 98 S. Ct. at 1060.) Although Hernandez testified that he turned himself in on July 6, Officer Garza's supplementary report indicated that he was arrested on the same day in connection with the offense. Additionally, by the time of trial, Hernandez was facing a murder charge of his own and admittedly expected "some consideration" for his testimony against defendant. Thus, Hernandez' testimony cannot be viewed as purely voluntary.

Although as an eyewitness Hernandez' testimony was crucial to the State's case and to the fact finder, we are nonetheless compelled to conclude that the trial court erred in denying defendant's motion *in limine* to exclude the testimony which was inextricably tainted by defendant's illegal arrest.

We now consider whether this error warrants reversal of defendant's conviction. While in a bench trial the judge is presumed to know the law and to consider only proper evidence in rendering judgment, that presumption can be overcome by an affirmative showing to the contrary. (*E.g., People v. Alford* (1982), 111 Ill. App. 3d

741, 744, 444 N.E.2d 576, 578.) In the case at bar, the judge stated that both Hernandez and Julian were credible and that Julian's testimony "coupled with the admittedly unsavory Hernandez is enough to convict." Additionally, he referred to Hernandez' testimony in reducing defendant's conviction from first- to second-degree murder when he noted that defendant told Hernandez that he shot Vasquez because he "had something" and that Vasquez had reached for something in his waistband. These comments indicate that the judge relied on Hernandez' testimony in considering defendant's case and, therefore, the presumption that he weighed only competent evidence has been sufficiently rebutted. Accordingly, because defendant was prejudiced by the judge's consideration of evidence which should have been excluded, we reverse defendant's conviction and remand for a new trial. See *People v. Fair* (1977), 45 Ill. App. 3d 301, 306, 359 N.E.2d 848, 852 (where the trial court indicates that it considered incompetent evidence, the appellate court cannot presume that such evidence did not influence the court's judgment).

Defendant next argues that the trial court erred in denying his motion to strike Julian's testimony because the State had shown him a photograph of the suppressed lineup just before he testified.

The trial court was incorrect in asserting that the State could use the photograph of the suppressed lineup in unlimited ways outside of the courtroom. However, an in-court identification need not be stricken even when a witness has been exposed to a previously suppressed lineup photograph if the State shows by clear and convincing evidence that the identification was "uninfluenced by and independent of the suppressed evidence." *People v. Taylor* (1987), 163 Ill. App. 3d 346, 355, 516 N.E.2d 649, 655, *appeal denied* (1988), 119 Ill. 2d 572, 522 N.E.2d 1254.

The Supreme Court in the seminal case *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, held that incriminating statements, as well as physical evidence, obtained as a result of an illegal arrest and search should have been excluded from evidence because police came upon them by exploiting the original illegality and not " 'by means sufficiently distinguishable to be purged of the primary taint.' " (*Wong Sun*, 371 U.S. at 488, 9 L. Ed. 2d at 455, 83 S. Ct. at 417, quoting Maguire, Evidence of Guilt 221 (1959).) In *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, the Court promulgated its "independent origin" test, setting forth various factors for trial courts to consider when applying the *Wong Sun* holding in the context of in-court identifications. They included: (1) the witness' prior opportunity to observe the criminal act; (2) the discrepancy, if any, between pre-lineup descriptions of the

suspect and the witness' description; (3) any identification made by other witnesses before the lineup; (4) the identification, if any, of the defendant from photographs before the lineup; (5) the failure to identify the defendant on a prior occasion; and (6) the length of time between the alleged crime and the lineup identification. *Wade*, 388 U.S. at 241, 18 L. Ed. 2d at 1165-66, 87 S. Ct. at 1940.

Later, in *Crews*, the Supreme Court reaffirmed that an in-court identification following a suppressed lineup need not be excluded as fruit of the poisonous tree if the victim's recollection of the defendant was independent of the suppressed lineup. (*United States v. Crews* (1980), 445 U.S. 463, 471-72, 63 L. Ed. 2d 537, 546-47, 100 S. Ct. 1244, 1249-50.) In addition to the *Wade* factors, the Court examined the length of time between the crime and the in-court identification and whether there were any discrepancies between pretrial identifications of the defendant and his actual appearance. (*Crews*, 445 U.S. at 473 n.18, 63 L. Ed. 2d at 547 n.18, 100 S. Ct. at 1251 n.18.) In *Crews*, the trial court had granted the armed robbery defendant's suppression motion, thereby excluding evidence of a lineup where the victim had identified him. After the victim identified the defendant in court, he argued that it should not have been permitted. The Court, however, found that the in-court identification was sufficiently independent of the suppressed evidence because the victim had viewed the assailant from close range for 5 to 10 minutes under excellent lighting conditions, identified only the defendant, and just one week had passed from the time of her initial observation of the defendant until her first identification of him. *Crews*, 445 U.S. at 473 n.18, 63 L. Ed. 2d at 546 n.18, 100 S. Ct. at 1251 n.18.

Illinois courts have adopted the rationale of *Wade* and *Crews* and have utilized the factors set forth in those cases. (*E.g., People v. Williams* (1987), 118 Ill. 2d 407, 515 N.E.2d 1230; *People v. Curtis* (1986), 113 Ill. 2d 136, 497 N.E.2d 1004, *cert. denied* (1987), 481 U.S. 1014, 95 L. Ed. 2d 497, 107 S. Ct. 1890.) In *Taylor*, the defendant in a robbery case succeeded in having his arrest quashed and in having evidence of a lineup identification suppressed. (*Taylor*, 163 Ill. App. 3d at 349, 516 N.E.2d at 651-52.) The court, however, did not prohibit in-court identifications of the defendant. At trial, two witnesses who had not seen the defendant in a lineup, but had identified him in court, testified that the State's Attorney had shown them a photograph of the lineup before they testified. We noted that neither witness had previously identified the defendant, that their in-court identifications occurred nearly two years after the robberies, and that both witnesses' earlier descriptions of the robber differed significantly from the defendant's actual appearance; we therefore

held that the State failed to meet its burden of showing that the identifications had a source independent of the suppressed lineup. *Taylor*, 163 Ill. App. 3d at 361-62, 516 N.E.2d at 657-59.

*People v. Duarte* (1979), 79 Ill. App. 3d 110, 398 N.E.2d 332, more closely parallels the case at bar. In *Duarte*, a witness testified that he saw the defendant and others attack the victim at about 11 p.m. from 55 feet away through his bedroom window, which was open about four inches. The scene was lit only by streetlights at either corner and a beer sign at the bar. The witness testified that he observed the offense for about one to two minutes, although he also testified that he attempted to phone police while viewing the offense. The defendant contended that the police provided the witness with an overly suggestive photo identification procedure two days after the offense, rendering his in-court identification unreliable. We held that even if the identification procedure had been overly suggestive, the witness' in-court identification had an independent origin. Although testimony conflicted on the lighting, the witness and a police officer testified that the scene was well lit. The witness had an unobstructed view, appeared to have a "concentrated degree of attention" to the occurrence, and was unwavering in his identification. Noting that in his initial description of the defendant, the witness had estimated the defendant's height to be about six inches taller than he actually was, we attributed this inaccuracy to the fact that the defendant was moving throughout the occurrence. *Duarte*, 79 Ill. App. 3d at 121-22, 398 N.E.2d at 341.

■ In the case at bar, we hold that Julian's in-court identification of defendant was admissible. The judge, acting as fact finder, determined that it was possible for Julian to view the shooting from 68 yards away under the existing lighting conditions. Applying the *Wade/Crews* factors, we find that they favor the admissibility of Julian's identification testimony: he had an adequate opportunity to observe the shooting and he identified defendant before the grand jury which convened shortly thereafter. While the record does not show that Julian furnished any other description of the shooter to provide a comparison to defendant's actual appearance, Julian knew defendant from seeing him on four other occasions, the most recent having occurred one week before the shooting; he thus was not identifying a stranger. In addition to Julian, Officers Butler and Ostrowski testified that the alley was well lit. Furthermore, the judge expressly found Julian to be a credible witness, and credibility was his to assess in this case. (*People v. Aguilar* (1991), 218 Ill. App. 3d 1, 3, 578 N.E.2d 109, 114, *appeal denied* (1991), 142 Ill. 2d 656, 584 N.E.2d 131.) Although Julian's grand jury testimony and trial

testimony conflicted regarding the exact address from which he viewed the shooting, this inconsistency is not of such magnitude that his testimony should be discredited. See *People v. Jefferson* (1971), 133 Ill. App. 2d 221, 225, 272 N.E.2d 757, 760-61 (in a bench trial, even though a police officer testified on cross-examination that he and defendant made a 37-block drive during rush hour within five minutes, after testifying on direct examination that the trip took 30 minutes, the appellate court would not deem his testimony incredible, since the trial court was the arbiter of credibility of witnesses); see also *People v. Zazzetti* (1979), 69 Ill. App. 3d 588, 388 N.E.2d 82 (although the witness viewed the offender under less than ideal lighting conditions, had consumed several drinks prior to his observation, and saw the offender for only three or four seconds, the fact that the witness was acquainted with him supported the reliability of his identification of the defendant).

We therefore hold that Julian's in-court identification was sufficiently independent of the State's use of the suppressed lineup evidence; the court therefore properly admitted it.

Although it would almost seem trite at this late date to say that the testimony of a single, credible identification witness is sufficient to support a conviction if the witness positively identifies the defendant, even if the identification occurs under less than ideal circumstances (*Zazzetti*, 69 Ill. App. 3d at 592-93, 388 N.E. 2d at 86), the trial judge's comment that he was relying on *both* Hernandez' and Julian's testimony leaves us uncertain as to whether he found Julian's testimony alone sufficient to support defendant's conviction.

Therefore, since we cannot conclude that the judge considered only Julian's admissible eyewitness testimony in convicting defendant, we reverse and remand for a new trial.

Reversed and remanded.

DiVITO, P.J., concurs.

JUSTICE McCORMICK, concurring in part and dissenting in part:

I concur with the majority's conclusion that defendant is entitled to a new trial because of the use of incompetent, prejudicial evidence (Hernandez' testimony) by the trial court. A remand for a trial *de novo* on all issues would be a proper order in this matter because the suppressed testimony of Hernandez was also considered by the trial court as corroborative of Julian's testimony and credibility. However, the majority opinion proceeds further and concludes that, as a matter

of law, Julian's in-court identification was sufficiently independent of the State's improper use of the suppressed lineup evidence. Hence, this conclusion of law is binding on the trial court in the new trial. I dissent from this conclusion of law.

At trial, Julian testified that at the time of the shooting he was standing on a neighbor's porch on south Morgan Street. Later, Julian testified that he was on 32nd Street at the time of the shooting. Before the grand jury, Julian testified that he was on his own front porch, a third location. The shooting incident occurred at approximately *11:30 p.m. in an alley illuminated by artificial light.* Julian was admittedly *206 feet from the place of the incident.* The trial court commented that, "*I do not know that it is impossible* as suggested by the defense *to recognize a person from 68 yards away.* \*\*\* The key is that you know the individual. Now, in this case Julian testified that he had seen the defendant at least four times and knew him from the area." (Emphasis added.) However, Julian could not recall the dates of the three occasions he had seen defendant prior to the shooting. Julian did not give the police defendant's name or his physical description. At the time of defendant's arrest, defendant did not match the description of any known offender in this case. Julian testified that he did not recognize defendant at first, but that he eventually recognized him in a lineup. Julian made an in-court identification of defendant as the shooter, but stated that he had been shown a photograph of the lineup prior to his taking the stand to testify. The lineup, including the photograph, had previously been suppressed by the trial court.

The law recognizes that reliability is the linchpin in determining the admissibility of identification testimony and reliability must be determined under the totality of the circumstances. (*Manson v. Braithwaite* (1977), 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253.) If a witness has seen a previously suppressed lineup photograph, the witness' identification testimony should be suppressed. The burden is on the prosecution to show, by clear and convincing evidence (*People v. Duarte* (1979), 79 Ill. App. 3d 110, 398 N.E.2d 332) that the identification is uninfluenced by and independent of the suppressed evidence (*People v. Taylor*, 163 Ill. App. 3d 346, 516 N.E.2d 649).

The courts have recognized that, once an improper photograph is shown to a witness, there is some danger that the witness is apt to retain in his memory the photographic image, rather than the person actually seen, reducing the trustworthiness of subsequent courtroom identification. *Simmons v. United States* (1968), 390 U.S. 377, 383-84, 19 L. Ed. 1247, 1253, 88 S. Ct. 967, 971.

The majority cites *Wade* and the six factors which should be analyzed in determining if an identification is independent. A discussion of the applicability of these factors to the facts of this case, contrary to the majority's analysis, in fact inescapably leads to a conclusion that the in-court identification is unreliable and is not independent of the suppressed photograph:

(1) The witness' opportunity to observe the criminal act: I need not repeat my previously stated comments regarding distance and lighting conditions.

(2) The discrepancy, if any, between pre-lineup descriptions of the suspect and the witness' description: The facts of this case create a scenario more lacking than a mere discrepancy in the description of defendant. Julian was questioned by the police relative to his observation of the shooting. Julian did not inform the police that the offender was someone he knew from the neighborhood. Julian did not give a physical description of defendant as the offender.

(3) Any identification made by other witnesses before the lineup: In this case there was no identification by another witness (except the excluded testimony of Hernandez).

(4) The identification, if any, of defendant from photographs before the lineup: Julian did not identify defendant from a photograph prior to the lineup.

(5) The failure to identify defendant on a prior occasion: Julian admits that he did not recognize defendant at the scene of the shooting. He testified that he first recognized defendant at the suppressed lineup.

(6) The length of time between the alleged crime and the lineup (in-court) identification: Two years and two months elapsed from the date of the crime to the date of the in-court identification.

None of these factors supports the conclusion that the in-court identification is independent and purged of the taint of the suppressed photograph. There is no corroboration of Julian's in-court identification, and the totality of the circumstances cries out for a finding that said identification is tainted and unreliable.

The cases cited by the majority are distinguishable from the case at bar. In *Crews*, the witness viewed the assailant from close range for 5 to 10 minutes under excellent lighting conditions and identified the defendant just one week from her initial observation of him. In *Curtis*, the witness had been in the presence of the defendant for 15 to 30 minutes under excellent conditions and his description closely matched the defendant's actual appearance. The case at bar is more akin to the *Taylor* case cited by the majority. In *Taylor*, the witness, who had not previously identified the defendant, was shown a

photograph of a suppressed lineup. The in-court identification occurred two years after the crime and the earlier description of the defendant differed significantly from the defendant's actual appearance. In the *Taylor* case, we held that the State failed to meet its burden. Similarly, in the case at bar, the State failed to meet its burden to prove by clear and convincing evidence that the in-court identification by Julian was independent and reliable.

Finally, the majority's reliance on the trial court's determination that Julian was a credible witness, to further lend support to its *Wade* analysis to the facts of this case, is misplaced. While the majority acknowledges that for the purpose of a finding of guilty it cannot determine the extent of the trial courts' reliance on Hernandez' testimony from that of Julian's testimony, it fails to recognize that the same troublesome problem exists relative to the court's reliance on Hernandez' testimony in determining the credibility of Julian's testimony and in-court identification. Hernandez' testimony was corroborative of Julian's and, as the majority observes, "the judge stated that both Hernandez and Julian were credible and that Julian's testimony 'coupled with the admittedly unsavory Hernandez is enough to convict.' " (268 Ill. App. 3d at 232.) This comment, like those the majority articulates in ruling that Hernandez' testimony prejudiced defendant, clearly indicates that the court relied on Hernandez' testimony in determining the credibility of Julian's testimony and in-court identification of defendant. Just as the extent of the judge's reliance on Hernandez' testimony in finding defendant guilty cannot be ascertained, the extent of the judge's reliance on Hernandez' testimony in determining Julian's credibility, and consequently defendant's guilt, cannot be ascertained.

For the reasons stated, I would reverse the trial court's finding that Julian's in-court identification was independently reliable and admissible in court.